## THE NEW YORK FIREMEN INSURANCE COMPANY
### *against*
### DE WOLF.

Insurance, by the defendants, on a cargo, at and from New York to Havana, and at and from thence to Laguira and Porto Cavello, or either of them, at a premium of seven per cent. to return five and a quarter per cent. if the risk ended at H., without loss, or two per cent. if only one of the two other ports was used, and the risk ended without loss: warranted American property. The cargo, consisting of flour and pork, was

purchased of the plaintiff a native American citizen residing in New York, by L., a Danish citizen of St. Thomas, then in New York, under a contract entered into here, by which the plaintiff agreed to deliver the cargo to L., at Havana, or at Laguira, or Porto Cavello, at five per cent. advance on the invoice, or cost, paid by the plaintiff, and the freight, and premium of insurance, paid by the plaintiff. The cargo was consigned, by the plaintiff, to Spanish merchants, at Havana, (designated by L.,) with instructions to dispose of the cargo, for the plaintiff's account, &c., or to send it to another market, that is, to a windward port. The bill of lading expressed, that the cargo was shipped for the account and risk of the plaintiff, to be delivered at Havana, to H. & C. or their assigns, paying no freight, it being the property of the owner of the vessel : On the arrival of the vessel at Havana, the consignees interlined the bill of lading with the words, " or a market ;" and directed the master to proceed to Laguira ; and while proceeding to Laguira, the vessel was captured, near that place, by a Venezuelan privateer, and carried into a port in the island of Margarita, and the vessel and cargo libelled in the admiralty court there, and the cargo condemned as prize, &c.

In an action on the policy to recover for a total loss : *Held*, that the cargo was, and remained the property of the plaintiff, until its delivery at one of the ports mentioned ; that there was no delivery, or acceptance of it, at Havana ; and that the consignees there, in directing the master to proceed to L., acted as agents of the plaintiff, who continued to be, and was the owner of the cargo, at the time of its capture ; and that, therefore, the warranty was complied with.

That such a contract of sale is legal and valid, both by the municipal law of this country, and by the law of nations, and does not destroy the neutral character of the property.

That the plaintiff was not bound to disclose to the defendants the facts and circumstances of the contract ; for even if they were material, yet the insured is not obliged to communicate any fact, as to which there is a warranty, express or implied.

Where, on a sale of goods, no time is stipulated for the payment, the price is to be paid on their delivery to the purchaser.

Provisions shipped by a neutral, with a view to supply the army or navy of a belligerent, are not contraband of war.

On the contrary, such a destination is perfectly lawful.

The right of neutral and peaceful states, to carry on commerce with countries at war, excepting in contraband articles, and with places in a state of blockade, is perfect and unquestionable :

Though the question may frequently arise whether the contract is a fraudulent disguise, to give to the property the character of neutrality during its transit ; and whether the property, in truth belongs to the neutral or the enemy.

The principle of the law of nations, laying out of view the case of contraband articles, and of places actually invested, is, that the property of a neutral, in its passage to a country at war, is free ; and that the property of the adverse belligerent is subject to capture and forfeiture.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
Wolf.

It is settled that the sentence of condemnation by a foreign court of admiralty is not conclusive, but only *prima facie* evidence of the facts upon which it purports to have been founded; and this court will not hear an argument in favor of its being conclusive.

Other points were discussed by counsel, but not decided, viz.

1. Whether our courts will recognize a war between a colony and the mother country, as a lawful war, before the independence of the former is acknowledged, either by the mother country or our own government.
2. Whether a colony, being acknowledged independent, is bound by the treaties existing between the mother country and foreign nations.

ERROR from the Supreme Court. The facts appear sufficiently in the report of the same case in the Court below. (20 John. Rep. 214.)

The reasons for the judgment of the Supreme Court were assigned as in 20 John. 225 to 229.

*D. B. Ogden*, for the plaintiff in error. We rely on the following grounds for a reversal of the judgment rendered by the Court below :

1. The cargo of the brig George Washington, upon its shipment at New York, became the property of Moses E. Levy, and its delivery, if not complete at New York, became so at Havana.

2. The voyage insured by the policy in this case, terminated at Havana.

3. The cargo of the George Washington, at the time of the capture and condemnation, was not American property, within the terms and meaning of the warranty contained in the policy.

4. The contract under which the cargo was shipped, was calculated to increase the risk, and, therefore, ought to have been disclosed to the under-writers, as ought also the letter of instructions from the assured to the master, and the letters from the assured to Hernandez & Chavitau.

5. The transaction was a mere cover to belligerent property, and was, therefore, a fraud upon belligerent rights.

6. The sentence of condemnation is conclusive evidence that the cargo was not American property, and so the Court ought to consider it.

The two letters of July 21, 1818, are relied upon to prove the contract between De Wolf & Levy. It was made at a

period of open war between the Spanish government and the republic of Venezuela; which was declared as long ago as July 30th, 1811,(a) and has continued to rage ever since that time. This, though carried on between the colony and the mother country, was a lawful war after that day, on which her declaration of independence was dated. (1 Nile's Reg. 125.) In *Ware* v. *Hilton et al.*,(b) Chace, J. says, "Before our acts of separation from the crown of Great Britain. the war between Great Britian and the United Colonies, jointly and separately, was a civil war; but instantly on the declaration of independence, the war changed its nature, and became a public war between independent governments; and immediately thereupon all the rights of public war (and all the rights of an independent nation) attached to the government of Virginia.

The President's message of Dec. 6th, 1817,(c) speaking of the character of war, says, "the United States have regarded the contest, not in the light of an ordinary insurrection or rebellion, but as a civil war between parties nearly equal, having, as to neutral powers, equal rights. Our ports have been open to both, and every article, the fruit of our soil, or of the industry of our citizens, which either was permitted to take, has been equally free to the other;" and in *The United States* v. *Palmer et al.*,(d) Ch. Justice Marshall lays down the rule that the proceedings of our Courts of Justice in relation to a part of a foreign empire, which asserts, and is contending for its independence, must depend entirely on the course of our government.

All our Courts, then, are bound to treat the war as an existing and lawful one. The Executive is the judge by whose decision this Court is bound to abide; and I shall proceed upon the foundation that this contract was made at a time of lawful war between the people of Venezuela and the King of Spain.

Who were the parties to this contract? De Wolf was an American citizen : Levy, being resident in the Spanish island of St. Thomas, must be considered as a Dane. The brig left New York, and proceeded on her voyage to supply the Spanish government with provisions, either at Havanna or Porto Cavello, the two great naval depots of

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

(a) 1 Niles'
Reg. 105, 121
no. 7, 8.

(b) 3 Dall
224.

(c) 13 Niles'
Rog. 236.

(d) 3 Wheat.
Rep. 634, 5

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

(e) 2 John.
Cas. 180.

(f)          4
Cranch, 197.

(g) In Lud-
low v. Dale, 1
John. Cas. 18.

(h) 1 John.
Cas. 360.

Spain in the neighborhood of Venezuela. Can property shipped under such circumstances, destined as it was to aid Spain in her unholy efforts against Venezuela, be considered American? What is the meaning of this warranty? Ch. Justice Spencer says truly, in giving the opinion of the Court below, "It means that the property was American by the law of nations." It is said in *Vos & Graves* v. *The United Insurance Company*,(e) that " it is a settled rule that the insured, in order to comply with his warranty, must not only maintain the property to be neutral, but so conduct himself towards the belligerent parties, as not to forfeit his neutrality. He must pursue the conduct, and preserve the character of a neutral." In *Fitzsimmons* v. *Newport Insurance Company*,(f) Marshall, Ch. J. remarks, " It is contended by the counsel for the underwriters, that a ship warranted to be American is impliedly warranted to conduct herself during the voyage as an American, and that an attempt to enter a blockaded port, knowing it to be blockaded, forfeits that character." *This position cannot be controverted.*

The question whether the warranty is complied with, then, is not confined to the strict and narrow principles of the common law; but depends upon the law of nations. The true inquiry is whether the property be neutral. The answer to this question comes most properly from the Courts of admiralty, which, as remarked by Kent, J.(g) " are especially received as binding; because they proceed upon general principles of the law of nations, applicable to all suitors, and of universal extent and reception. They are governed by one and the same law, equally known to every country, and equally open to all the world." In *Duguet* v. *Rhinelander*,(h) Radcliff, J. says, " I am of opinion, that the warranty of American property ought to be construed in reference to the belligerent parties. It was intended that the property should be neutral *in regard to them.*" Kent, J. in the same case says, " I think that the warranty of neutrality must be considered in reference to the law of nations, and the true question, is it to be considered a *Frenchman* or an *American according to that law?* It is immaterial how he was considered in France, or by the municipal law, because

the parties, by the true construction of the contract had in view a protection on the high seas, under the sanction of the general law." So here, this contract was not only made in time of war, but in express reference to that war. If in time of peace, there was no need of the warranty. The parties meant something by it; and the language of the insurers is, "Because a war does exist, we will not risk the property, being American. We claim the protection of the law of nations upon it as American property." Was it protected by the law of nations? If it was so protected, the warranty is complied with; otherwise it is violated. The cargo was flour and beef, shipped under a contract with the Spanish government to supply their army or navy, to aid in carrying on the war against Venezuela. Independent of authority, I ask every man of common sense, whether if captured by Venezuela, it would be protected as American property? Had this property been shipped under similar circumstances to supply the British army while at New York, during the revolutionary war, would not our Courts of Admiralty have condemned it? Were we at war with another country, would not our Courts of Admiralty now do it? Let our Courts beware how they pronounce property thus circumstanced, beyond the reach of condemnation. We may commend the poisoned chalice to our own lips. If our country is attacked, it will be from abroad. Our invaders must be supplied by provisions from abroad, which may always be secured against condemnation by the intervention of a neutral, and an executory contract of sale. No case can be found warranting neutrals in such extravagant claims.

But we shall be told that the defendant in error was innocent, that he knew nothing of the object for which the purchase and shipment were made. We answer, it is immaterial whether he knew it or not. He has made a full warranty, and in so doing has taken the knowledge upon himself. He was bound to know the object of the voyage. The warranty was intended to throw the risk upon him. It is a novel doctrine that ignorance shall operate as a protection where there is a breach of an express warranty. In the case of a mere implied warranty of sea-worthiness, know-

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf

ledge is never material. Why does a contrary doctrine apply here? Is there any difference in principle between the two cases? An express warranty is always binding in all cases, whether the warrantor know it to be true or false.

But suppose knowledge to be necessary. De Wolf had full notice. It is an established principle in equity, and acknowledged in all the books, that circumstances sufficient to put a prudent man on inquiry, is equivalent to notice. Such circumstances exist in the present case. Both parties to the contract of sale were neutral. It was natural for De Wolf to inquire of Levy, " Why do you wish the cargo to retain its character of American property?" A Danish character would have answered the same purpose. Levy was a merchant of St. Thomas. For what purpose did he wish a cargo of flour at Havana? Why not ship it in his own name? Having such multiplied causes for suspicion, it is impossible that De Wolf should not have been put upon inquiry, and finally have known all about this affair. Every document shows that the cargo was not, in fact, shipped in the name of De Wolf, and every appearance in favor of the cargo being De Wolf's, is evidently a mere cover to the transaction. The letters which treat it as his property, and under his direction, were known and approved, and two of them were signed by him. He directs it to different markets, and assumes the disposition of the property as if it was to pass at his own risk, although he had previously sold it to Levy. He states in his letter to the consignees, that the cargo was to be sold on his account, whereas it was to be delivered to Levy, and it was immaterial to De Wolf what end it came to. Why lend himself to cover the transaction in this manner, if he did not know the object?

The property was rightfully condemned. Although, as between the parties, the payment may be contingent, depending on the delivery of the property, which remains at the risk of the neutral, and such a contract may be lawful in peace, yet it is otherwise during war. In the case of *The Sally Griffiths,*(i) the Court say, " It has always been the rule of the prize Courts, that property going to be de-

(i) 3 Rob.
Adm. Rep.
300, in note.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

lı̇vered in the enemy's country, and under a contract to become the property of the enemy, immediately on arrival, if taken in transitu, is to be considered as enemy's property." It is hardly possible to find a case more similar to the present than that of the Sally Griffiths. The property in that case was shipped under a contract with France, to supply the French armies, and covered, as here, with the semblance of American character. If that case be law, there is an end of this cause. But Ch. Justice Spencer, speaking of the decision in that case, says he considers the doctrines advanced by Sir William Scott, "the result of power forgetting right, and the offspring of state policy, created for the occasion." It is unfortunate for the learned Judge, that Sir William Scott did not make the decision which he imputes to him. It happens to have been made by Earl Mansfield, Sir R. P. Arden, Master of the Rolls, and Sir W. Wynne. This, alone, is perhaps not very important; but the Chief Justice committed another mistake, in relation to that case, which is so. Far from being a peculiar doctrine of Sir William Scott, and "the result of power forgetting right," the case shows that the rule by which it was decided is an ancient one, which had been frequently acted upon. The cargo must have been considered as enemy's property upon every principle. Adopt a contrary rule, and it is impossible for belligerents to protect themselves by seizing any property which should be afloat. Very soon there would be no such thing as enemy's property. Some De Wolf will always be found to shield it with his name.

Again, says Chief Justice Spencer, "if the contract would be a legal one in time of peace, which Sir William Scott expressly admits, and if the property would be deemed the plaintiffs, until actual delivery at one of the elected ports, what would vitiate this contract, or make the property the vendee's, before the performance of the condition precedent, according to the law of nations? Certainly not because there was war between Spain and Venezuela." Now the true answer to the question put is, precisely, that there was a war. There was a right to make the contract, but it is illegal because the war intervened. War, therefore, makes

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

all the difference. Why would this contract have been lega. in time of pence? Because it would then depend upon the municipal law of the state where it was made, or is to be performed. In the event of war, it is governed by the common law of nations. These principles do not rest on British authority alone. They have been followed up in this country. In time of war another party is raised up. It is no longer a mere question of *meum* and *tuum*, between two individual citizens. It is a settled principle of national law, that property so shipped by a neutral as to impose upon a belligerent, is itself a cause of condemnation. A neutral has his rights, but he also has his duties. He has no right to protect belligerent property. It is lawful for one enemy to deceive another. In that case fraud is legal, and perhaps moral; but it is otherwise with a neutral. He ought to act in good faith towards both belligerents. "I wish neutrals," says Sir William Scott,(*j*) " to understand, that if they mean to avail themselves of the rights of neutrals, they must conduct themselves as such. It will then be the duty of this Court, and the ambition of it, to exert its utmost vigilance to give them the benefit of their neutrality. But, on the other side, if they discredit their case, by a clothing of prevarication and falsehood, who is to blame for the inconveniency that may ensue?" In this case the answer is easy. De Wolf has covered this property, and ought to be visited with the legal consequences of such an act. " By the modern law of nations," says Justice Story,(*k*) " provisions are not, in general, deemed contraband; but they may become so, although the property of a neutral, on account of the particular situation of the war, or on account of their destination. If destined for the ordinary use of life in an enemy's country, they are not, in general, contraband; but it is otherwise, if destined for military use. Hence, if destined for the army or navy of the enemy, or for his ports of naval or military equipment, they are deemed contraband." This is going even farther than we wish to go in the present case. If this cargo was contraband, it was prize of war. It was not American property, within the meaning of the warranty. The same Judge, in the case of *The Ann Green*,(*l*) says, " The

(*j*) In *The Rosalie & Betty*, 2 Rob. Adm. Rep. 359.

(*k*) In *The Commercen*, 1 Wheat. Rep 387.

(*l*) 1 Gall. Rep. 291.

ALBANY,
Sept. 1823

N. Y. Firemen
Insurance
Company
v.
De Wolf

cases are, as I think, settled upon just principles, that decide that, in time of war, property shall not be permitted to change character in its transit; nor shall property consigned, to become the property of the enemy on arrival, be protected by the neutrality of the shipper. Such contracts, however valid in time of peace, are considered, if made in war, or in contemplation of war, as infringements of belligerents rights, and calculated to introduce the grossest frauds. In fact, if they could prevail, not a single bale of enemy's goods would ever be found upon the ocean." If a cargo of ordinary merchandize, thus shipped, (a mere cargo of dry goods, for instance,) would be deemed contraband, the reasons are ten-fold strong in support of the case which we present. This is not the doctrine of "power forgetting right," as was supposed by his honor Judge Spencer. It has always been, and always must be the doctrine of Courts of Admiralty.

This contract was made with a view to the law of nations. Upon questions of national law, common to all, it is your duty to follow the decisions of our national Court, the Supreme Court of the United States. If you decide in the face of the law of nations, you may involve the country in war. To avoid this hazard, the constitution has given cognizance of questions involving the peace of the nation to our Courts of Admiralty.

Chief Justice Spencer supposes that the question of property is settled by the case of *Ludlow* v. *Bowne & Eddy*, (m) That was a decision by the Supreme Court on a case, leaving to the parties no powers of appeal. The decision was by a divided Court, and Livingston, Justice, gave no opinion. Judgment was given for the plaintiff, by a bare majority. But had the judgment been unanimous, it would not be binding on this high tribunal, though I admit that it should be respected as the decision of learned Judges. At that time the cases cited from Wheaton and Gallison had not been decided. Had the Supreme Court been in possession of these authorities, they would doubtless have decided otherwise. This case is distinguishable from that of *Ludlow* v. *Bowne & Eddy*. In that case the cargo was not

(m) 1 John Rep. 1.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v
De Wolf.
shipped under a contract with a belligerent. There were in that case no letters or documents giving a false history of, and a false color to the transaction. It was a case of mere commercial adventure, not intended, as here, to supply the army or navy of the belligerent.

But whether this cargo was or was not American property, the condemnation is conclusive evidence against De Wolf. I am aware that in *Vandenheuvel* v. *The United Insurance Company*,(n) this Court decided that condemnation by a foreign Court of Admiralty, is only, *prima facie*, evidence as to the character of the property; but it has been so often decided otherwise, since that time, that I feel myself warranted in calling upon this Court to reconsider their former decision. The Supreme Court of the United States have passed upon the question.(o)

(n) 2 Caines'
Cas. Err. 217.
2 John. Cas.
451, S. C.

o) *Croudson et al.* v.
*Leonard*, 4
Cranch, 434.

SANFORD, Chancellor. Mr. President, I submit whether this question should be discussed. It is as perfectly settled by the case alluded to, as any question can be in this Court. The point decided in *Vandenheuvel* v. *The United Insurance Company*, was, that the sentence of a foreign Court of Admiralty is not conclusive on the character of the property, in an action on a policy of insurance. I am satisfied that the decision is correct. But if I thought otherwise, I should feel myself bound to say, that a question at rest, as this has been for 20 years, should not be opened. At this rate nothing is settled. Our citizens have regulated their conduct by the rule established in that case. Important rights have arisen under that rule. Ought they, at this day, to be drawn in question? Finding by one of the printed points in this case, that the sentence of condemnation was to be relied upon as conclusive, I had prepared a written resolution upon this subject, which is, that the President be requested to instruct the counsel not to argue this point.

STRANAHAN & CRAMER, Senators, concurred.

SUDAM, Senator. The resolution proposed by his honor the Chancellor is a surprise upon me. I was not aware that the point to which it relates would be made by counsel. The

ecisicn in *Vandenheuvel* v. *The United Insurance Company*, has been acquiesced in for a great number of years, and our decision against that case would unsettle the law: but I am not prepared, at this moment, to say that the Court ought not to hear the argument.  I know that this is a vexed question; and I should never be inclined to overrule a former decision of this Court upon slight grounds.

ALBANY,
Sept. 1823

N. Y. Firemen
Insurance
Company
v.
De Wolf.

WHEELER, Senator.  As a plain and unpractised man, I confess the proposition to interrupt the argument upon this question struck me with some surprise.  I had been taught that even Courts of justice may err, and that they will review their decisions when satisfied that they are wrong.  I understand it is proposed to show that the Supreme Court of the United States have passed upon the question, and overruled the former decision of this Court.  The decision of that high tribunal should be looked to by this Court with very great deference.  Is it not possible that the decision in *Vandenheuvel* v. *The United Insurance Company* may have been a mistaken one? and ought we, at all events, to withhold a reconsideration.

CLARK & EARLL, Senators, concurred with the Chancellor.

REDFIELD, Senator.  I was not aware that this question would arise.  My recollection of the case proposed by the counsel to be overthrown, is very imperfect; nor have I examined the other authorities alluded to, in relation to the question.  One of them is said to be a decision by the Supreme Court of the United States.  Now suppose an act of Congress had passed, determining the effect of these foreign sentences of condemnation, every Court in the Union would be bound to acquiesce.  I am not prepared to say that we ought not to listen to a decision of the Supreme Court of the United States, upon this commercial question, involving a point of national law, with almost the same degree of deference as to an act of Congress.

ALBANY,
Sept. 1823

N. Y. Firemen
Insurance
Company
v.
De Wolf.

SUDAM, Senator, moved to adjourn. He said that the interval of adjournment would afford time for consideration, and probably lead to a concurrence with his honor the Chancellor, and save a long argument upon a point which, perhaps, should not be argued. He felt that his honor the Chancellor's long experience in public business, and extensive acquaintance with commercial law, entitled his opinion, upon this question, to peculiar weight, but he would prefer looking into the cases before he pronounced one way or the other upon the resolution submitted.

Ogden. With leave, I will proceed upon another point, till the hour of adjournment shall arive.

SUDAM, Senator, withdrew his motion, and the counsel proceeded.

If the question of property is to be decided by the strict and narrow principles of the common law, the cargo, on its shipment, became the property of Levy. If not, it became so at Havana, or on its capture. I have already shown that little reliance can be placed on the letters and documents of De Wolf. *Falsus in uno, falsus in omnibus.* What was the object? To defraud the government of Venezuela; or, failing in this, to impose upon the insurers. I make this remark in reference to the letters of the 21st of July, which were doubtless written with an eye to the safety of this very property. The negotiation was pending some days, during which the whole scheme was probably settled. The parties saw that their plan might yet be defeated, if the property should be captured, and to secure themselves against all events, they next resort to the expedient of an insurance. The plaintiffs in error insured upon a warranty for a small premium. The letters were probably written by concert between De Wolf and Levy. The policy bears the same date with the letters; yet the cargo was not shipped till the 4th of August, leaving the letters to remain in New York. These letters amount, in fair construction, to a sale of the

cargo, accompanied with an agreement, on the part of the vendor, in consideration of the one dollar freight, to carry it to Havana. When was the consideration to be paid? The time of payment, in contracts of this nature, when the payment is to be made in future, is almost as material as the payment itself. It is always so to a merchant. It is unaccountable that a future payment, of this importance, should have been left altogether indefinite as to time. There being nothing in the contract to show the time, we have a right to infer, from the nature of doing business, that the payment was made beforehand. De Wolf, by the letter of the 3d of August, requested Hernandez & Chavitau to furnish money for the disbursements of Capt. Pratt, taking his bill on De Wolf for reimbursement. This was to be in case the brig discharged at Havana. It is plain, therefore, that no money was to have been paid at Havana. If paid there, the reimbursement would most naturally have been out of the moneys paid. Even these ordinary disbursements were provided for in New York, where the contract was made, furnishing an additional presumption that the money was paid there. If not, when was it paid? Did De Wolf receive notes? Why not produce them? He was a merchant understanding his business; and we are to presume that the money was paid, which superseded all further provision for payment. Is it possible that it would not have been noticed in the agreement, if to be paid for after notice of delivery at Havana? The case of *Ludlow* v. *Bowne & Eddy*, had already been decided, and it was under the authority of this case that the contract was made. It is plain that De Wolf was a mere agent. Levy was the one solely interested. He purchased the cargo at 5 per cent. advance. His funds paid for it. He was to pay the freight stipulated, and the premium of insurance. The whole was at his risk; and this insurance was not upon American but Danish property.

But suppose the cargo was not purchased by Levy at New York. Suppose it a contract to send De Wolf's property to Levy. On the delivery of the property it would become Levy's. The cargo is shipped with a bill of lading, and

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

no freight was to be charged at Havana. The delivery on board the vessel, of the cargo consigned to Hernandez & Chavitau, was a delivery to Levy himself. They were pointed out to him as the consignees—they were possessed of his instructions. A delivery on board the vessel, with a bill of lading, is a delivery to the consignee, for all purposes except that of stoppage *in transitu*. Viewing this as the common case between vendor and vendee, then, the cargo was Levy's before it left the port of New York. What is meant by the delivery of property? Placing it under the control and direction of the vendee. As an illustration, take a familiar case. The vendor delivers the key of his warehouse, containing the goods sold. This is a delivery of the goods. The books are full of such cases. Who had the control of the vessel at New York? De Wolf had parted with all his control, and given orders to deliver the cargo to Hernandez & Chavitau.

[Here the Court adjourned for the day. On re-assembling the next morning,]

SUDAM, Senator. I have looked into the case of *Vandenheuvel* v. *the* United Insurance Company. I find that in the Supreme Court three of the justices give an opinion— one had not heard the argument, and one was absent. In this Court the decision of the Supreme Court was unanimously reversed, with the exception of Van Vechten, Senator. A note to this case gives the decisions of other Courts upon the same question. I have also looked into the case of *Croudson* v. *Leonard*,(p) in which a majority of the Supreme Court of the United States held the sentence of condemnation conclusive, and examined other cases which were cited and relied upon in support of that decision; and I must say that I now concur most cheerfully with his honor the Chancellor, in thinking that we ought not to allow the question to be argued. It would be inexpedient and unwise, even to hear it discussed. It has been settled, and has not been stirred, in any case, since 1802.

(p) 4 Cranch, 434.

ALBANY,
Sept. 1823

N. Y. Firemen
Insurance
Company
v.
De Wolf

THE COURT unanimously concurred with the Chancel-or, and the argument for the plaintiff in error was resumed.

*Ogden.* But if the property did not pass, at New York, it became complete in Hernandez & Chavitau, at Havana. On arriving at Havana, their clerk altered the bill of lading, and altered the destination of the vessel. They thus exercised the entire control and direction of the brig. Were they the agents of De Wolf? No. I have already shown that they were the agents of Levy.

But suppose the delivery incomplete at Havana. We then contend that the capture by the cruizers of Venezuela was equivalent to a delivery to Levy. The captors succeeded to all his rights—to all the rights which he would have had in the property, if it had been actually delivered to him at Havana. This is the doctrine of *The Packet de Bilboa,*(q) which is also a strong case to show that the cargo was enemy's property under the first point. Sir William Scott says, "In time of war, these executory contracts cannot be permitted; for they would, at once, put an end to all captures at sea. The risk would, in all cases, be laid on the consignor, where it suited the purpose of protection. On every contemplation of war, this contrivance would be practised in all consignments from neutral ports to the enemy's country, to the manifest defrauding of all rights of capture. It is, therefore, considered to be an invalid contract in time of war; or, to express it more accurately, it is a contract which, if made in war, has this effect—that the captor has a right to seize it, and convert the property to his own use; for he having all the rights that belonged to his enemy, is authorized to have his taking possession considered as equivalent to an actual delivery to his enemy." De Wolf must be bound by the law of nations. *Ludlow* v. *Bowne & Eddy,* is not decisive of this point, as was supposed by the Court below. There the cargo was, in terms, to be paid for after its arrival in France, by a bill to be endorsed by a particular house in France. Ludlow had a right to hold the property as his own till the endorsement should have been made. The delivery was truly a condition precedent. And the

(q) 2 Rob. Adm. Rep. 133.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

opinions of the Justices turn on this point. There is nothing in this case which resembles that in these particulars.

But suppose this to have been American property. There was a fraudulent concealment from the insurers of circum stances material to the risk. " Every fact and circumstance which can possibly influence the mind of any prudent and intelligent insurer, in determining whether he will under-write the policy at all, or at what premium he will under-write it, is material. Therefore, whatever the insured knows respecting the state of the ship, the nature of the employ in which she is to be engaged, the time of her sail-ing, the time of her expected arrival, &c., ought to be fully and explicitly disclosed ; and the keeping back any fact of this sort, will be fatal to the contract ;"(r) " In such case," says Marshall,(s) " the concealment so vitiates the policy, that it will afford the insured no remedy, even from a loss arising from a cause unconnected with the fact or circum-stance concealed ; for a concealment is to be considered, not with reference to the *event*, but to its effect at the time of making the contract."

(r) Mar-
shall on Ins.
467.
(s) Id.

Has the communication, required by this authority, been made in the present case? *Durell et al.* v. *Bederly*,(t) contains the same principles which I have quoted from Mar-shall. Would the plaintiffs in error have underwritten, had they known that the cargo was destined for the Spanish ar-my through the hands of this Dane? Would they have lent themselves to the purpose of this fraud upon Venezue-la? Or, if willing to do this, would they have undertaken for the same premium? If you believe they would not, a disclosure of the fact was material, and the policy is void. But says the Chief Justice, " a party need not communi-cate anything with respect to a fact, in regard to which there is an express or implied warranty." It follows from this reasoning, that the opposite is the case with re-gard to a material fact concerning which there is no war-ranty. Now the warranty is merely that the cargo was American. Conceding for the sake of the argument, that it was American, the nature of the employment in which the vessel was to be engaged should also have been commu-

(t) Holt's N.
P. Rep. 283,
& 287, note.

nĭcated.(*u*)    There is certainly no warranty as to this ; and according to the Chief Justice's own reasoning, the policy would therefore be void.    The books are full of cases showing that what is warranted against, need not be communicated.    These are principally cases of unseaworthiness.    But ours is a different case.    The risk was materially varied by the object.    In *Carter* v. *Boehm*,(*v*) Ld. Mansfield says, " the reason of the rule which obliges parties to disclose, is to prevent fraud, and to encourage good faith.    It is adapted to such facts as vary the nature of the contract ; which one privately knows, and the other is ignorant of, and has no reason to suspect.    The question therefore must always be, whether there was, under all the circumstances at the time the policy was underwritten, a fair representation ; or a concealment ; fraudulent if designed ; or though not designed, varying materially the object of the policy, and changing the risk understood to be run."    According to the authorities, De Wolf should have communicated to the underwriters, not only his actual knowledge, but his information and belief in relation to material circumstances.

*J. O. Hoffman*, contra.    The defendant in error relies on the following points :

I. The cargo insured was, at the time of its shipment and insurance, and also of its loss, the property of De Wolf, and was not to become the property of Levy, until its delivery at Havana, or a port to windward.

II. The cargo never was delivered at Havana, or at Laguira, or Porto Cavello, being ports to windward, but was captured and thereby wholly lost on its passage to Laguira, the vessel having first touched at Havana.

III. By the tenor of the policy, the cargo was insured " at and from New York to Havana, and at and from thence to Laguira and Porto Cavello, or either of them." The vessel having a right, then, to stop at Havana, and proceed thence with the cargo to both, or either of the other ports, and having proceeded from Havana, for that purpose, with the cargo, the voyage insured could not, and did not terminate at that place.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

(*u*) Marsh.
on Ins. 467.
(*v*) 3 Burr
1905

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De W

IV. The cargo insured was American property at the time of its shipment, insurance and loss. The warranty, therefore, on the subject of the policy, was complied with according to its true intent and meaning.

V. There was no concealment on the part of De Wolf, the assured, that can vitiate his insurance; nor was he bound to disclose to the underwriters the contract with Levy, the letter of instructions to the master, and letters to Hernandez & Chavitau, or either of them, because his warranty made all representations in these respects unnecessary.

VI. There is nothing to impeach the good faith of the contract between De Wolf and Levy, or to show that the cargo insured was belligerent property, and covered as such by the assured; on the contrary, the contract was perfectly lawful, and in every respect consistent with the warranty in the policy.

Many of the arguments on the other side may be answered at once, by adverting to the nature of the contract of insurance, the necessity of preliminary proofs, and the variety of evidence submitted to the jury, upon which they were addressed at the Circuit. No special verdict was taken, but the case comes here on a bill of exceptions, to the points presented in which, the parties must be confined. It will be intended, that every question of fact was settled by the jury: and the questions of law must be taken upon the points alone, which were made in the Court below. The matters given in evidence by the defendant, were insisted upon by him as a conclusive bar to the action of the plaintiff; and he called upon the Judge to take it from the jury, and pronounce upon the facts himself. This he declined doing; submitted the whole to the jury; and the single question is, whether he erred in this particular.

But if I am wrong in supposing that the facts ought not to be considered here, how do they stand? The very object of neutrality is a free and open trade; such a trade as enriched this country during the war between England and France. It is extravagant, to call it nefarious, or in the least improper to supply belligerents with provisions. Venezuela enjoys no higher rights than any other belligerent,

merely because she is struggling against Spain. Would it be illegal to send provisions to Cadiz, because it is besieged by France? It is always lawful to supply belligerents, so long as the supply is mere matter of trade. The conduct of this trade is regulated by the law of nations. If in articles contraband of war, it becomes an offence cognizable before the Courts proceeding according to the course of the aw of nations, and punishable by confiscation.

The contract between De Wolf and Levy, is, on its face, perfectly honorable. Is there, as pretended, any secret fraud? Levy, a Dane, wished for provisions to fulfil a contract which he had made with the Spanish Intendant; and De Wolf contracted to deliver him those provisions at Havana, Laguira or Porto Cavello, at his own risk. Before the arrival of the brig at Havana, and afterwards on its transit to Laguira, or Porto Cavello, the cargo belonged to De Wolf. Was it not at his risk? Suppose a case of distress, and putting into a port of necessity, and a sale oi the cargo, would this have been for the use of Levy? Clearly otherwise. It would have been for the use of De Wolf. He would have been entitled to the avails. Had the cargo belonged to Levy, it would have been all along at his risk. The contract amounts to no more than that the cargo was deliverable at Havana, or some other port as Levy should direct. A greater or less proportion of freight was to be allowed, as the vessel proceeded to the one or the other of these ports. The profit was not merely the 5 per cent. on the invoice price. It was also the freight, which was an important object in a commercial adventure of this nature; and it was important that it should remain under De Wolf's control till finally delivered. There is no inconsistency in the bill of lading, with the supposition that the cargo was his property. It was impossible for him to tell what the freight would amount to, from the vessel being destined to different ports as Levy might direct. He relied upon his contract for freight. He accompanied this property by his agent during its transit with a view to his freight. An inference is attempted that the cargo was paid for in New York. The freight could not have been paid

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company.
v.
De Wolf.

for there, for. it was not yet earned, and it was uncertain what it would finally be.   The legal inference is, that goods are to be paid for when delivered, if no other time is stipulated by the parties.   The bill of exceptions declares expressly, that the goods were to be paid for on their delivery, and this appeared from the evidence of the plaintiffs in error.

It is complained that De Wolf did not ship in the name of Levy.   This would have been improper.   It would hav been to speak a language untrue in reference to the property of this cargo, which was to remain in De Wolf; and comes back to the question, to whom did the cargo belong ?  Take the case of a merchant in New York, who sells goods to his customer in the western part of this state, and contracts to convey the goods at his own risk as far as Albany —Is there any doubt that the property would continue in the vendor till the goods should arrive at Albany ?

With regard to the two letters directed to Hernandez & Chavitau, Levy may have had his private reasons why his name should not appear there.   This is a matter with which the underwriters had no concern.   Levy might not wish to be seen in the act of supplying the army or navy of Spain with provisions; as he might, at the same time, have been carrying on a profitable trade with her colonies.   But it does not follow that the letters were intended as a cover on the part of De Wolf.

The boldest assertion is, that De Wolf knew the destination of the goods, and understood the object for which they were purchased.   This is directly contradicted by the evidence of the plaintiffs in error ; the bill of exceptions states expressly, that De Wolf *did not know the object ;* and we have been entertained by an ingenious law argument to show that he ought to have communicated to the underwriters what was wholly unknown to him.   The underwriters knew the destination, and could appreciate the hazard.   They insured a voyage to the Spanish colonies on the face of the contract.   Was not this enough to put them on inquiry ?   It is much more probable that the object was known to the underwriters, than to De Wolf.   This also

disposes of another charge made against us : that of undue concealment.

But we are told, that by the strict principles of the common law, the property passed to Levy, by a delivery to the captain, while the cargo was yet in New York.   Wherever the property is placed at the risk of the consignees, there I admit the rule advanced on the other side ; that a delivery to the captain vests the title in the consignee.   But the error of the argument consists in applying that rule to a case where the cargo remains at the risk of the vendor.   In *Ludlow* v. *Bowne* & *Eddy*,(w) this distinction was very fully examined, and considered as settled by all the cases. Thompson, J. remarks, in that case,(x) " Whatever may be the general rules of law, and the ordinary course of commerce, applicable to any given class of cases, there can be no doubt that these general rules may be varied and modified, by special agreement. (3 P. Wms. 186.   *Godfrey* v. *Furzo,* 1 T. R. 748.)   This was admitted, in its fullest ex-'ent, by Sir William Scott, in the case of the *Packet De Bilboa,* (2 Rob. Rep. 133.)   The vesting of property, says Lord Mansfield, may differ according to the circumstance of cases, (*Davis and another* v. *James,* 5 Burr. 2680.)   The general rule of law is, that, as between vendor and vendee, the property is not altered till the delivery of the goods.   (*Snee & others* v. *Prescott & others,* 1 Atk. 245.   *Mason* v. *Lickbarrow,* 1 H. Bl. Rep. 35.   *Ellis* v. *Hunt,* 3 T. R. 469.)   A distinction is sometimes made between an actual delivery to the vendee himself, and a constructive delivery to some intermediate person.   In the latter case, when the goods are at the risk of the vendee, it is equivalent to an actual delivery. (3 T. R. 469.)"   The case in 1 John. was that of an absolute consignment to persons residing in France, and the consignees were parties to the contract.   This case is not so strong.   The consignment was to intermediate persons, Hernandez & Chavitau, for the very purpose of keeping the control of the cargo.   The agreement is—not that we were to deliver at New York ; but to Hernandez & Chavitau, or at Laguira or Porto Cavello.   No matter what the bill of la-

(w) Vid. 1 John. Rep 17 and 18.                    (x) Id. p. 9

ALBANY,
Sept. 1823

N. Y. Firemen
Insurance
Company
v.
De Wolf.

ing says.  It is controlled and modified by the agreement.
This was so held in *Ludlow* v. *Bowne* & *Eddy*.

There could have been no delivery at Havana, without
an acceptance.  If not accepted there, the goods were, by
agreement, to pass on to another port.  The very terms of
the contract forbade a delivery, unless Hernandez & Chav-
itau chose to accept them.  The consignees had the right
to receive the goods, or direct them to another port; and
they exercised, under Levy, the election that the goods
should proceed.  Levy had a right to this election, in con-
sideration of his agreement to advance the 5 per cent. and
pay additional freight.  He did not act as owner of the
goods.  The vessel arrived at Havana the 10th of Septem-
ber—never broke bulk; but on the 11th, was ordered to pro-
ceed to Porto Cavello; yet the real character of the trans-
action is sought to be changed by a fiction; a delivery at
New York or Havana.  Suppose an action for goods sold
and delivered, brought by De Wolf against Levy, bottomed
*on* a delivery at Havana: a lawyer would smile with con-
tempt at the idea.  Most plainly such an action would not
lie.  The endorsement on the bill of lading was necessary,
in exercising the election directed by the letter.  This course
was the strongest proof of fairness with regard to De Wolf.
The endorsement was openly made, and contained an order
to proceed.  The bill of lading was the very document on
which the direction should have been made, under the con-
tract.  There never was a delivery of the cargo.

As to the alleged fraud, and concealment, the jury have
passed upon it.  I have already shown there could have
been no fraudulent concealment by De Wolf; for he knew
nothing.  To avoid the contract, it must have been fraudu-
lent.  The premium was regulated according to the risk.
To Havana, it was 1¾ per cent.; but it rose to 5 per cent. as
the danger increased.  The underwriters understood them-
selves perfectly.  The question of fraudulent concealment
was properly a question of fact, or a mixed question of law
and fact, and the jury have found against it.(y)

We now come to the real question in the cause; which
is whether the warranty was violated, the cargo not being

*(y) Haywood
et al.* v. *Rod-
gers,* 4 East,
590.  *Living-
ston* v. *The
Maryland In-
surance Com-
pany,* 6
Cranch, 274.

American property. To say that it must be American property, in the largest sense of the law of nations, is too broad a proposition. The law of nations would afford no uniform rule; it is subject to alteration, by treaty. But before I proceed to examine this law, in reference to the question of property, I ask the particular attention of the Court to the case of *Ludlow* v. *Bowne & Eddy*, which was decided as long ago as 1806. I agree that when De Wolf and Levy made their contract, they had this very case in view, and acted in reference to it. It has been considered the law of the land ever since it was decided. There is not a feature in that case which does not tend stronger than any one in the case before us to prove collusion; and being presented in the shape of a case, the Court had a greater latitude of inference than can be taken here. The decision was not, (as supposed on the other side,) by a divided Court, so far as the question of property was concerned. Chief Justice Kent put the case on the ground of a fraudulent intention to cover belligerent property, admitting the principles on which the rest of the Court proceeded. By looking into that case, it will be seen that a *war risk* appears on the face of the contract, implying an interference with belligerent rights. It is true that bills on France were to be taken in payment, a circumstance relied upon to show that the property did not pass, because it was not paid for; but the goods of De Wolf were not to pass till delivered to the vendee. Three Judges denied that the contract was to be considered a cover, and questioned the decisions of the Courts of Admiralty as evidence of the law of nations. These Judges were governed by the language of the policy, and the real interest of the parties as understood by the municipal law. I invite the attention of the Court to the whole of that case, and if the reasoning of the Judges is not found convincing and conclusive, I am a stranger to the force of language. By adverting to the opinion of the Chief Justice, you will find that he would not commit himself upon the ground taken by the other Judges, but relied for his opinion solely upon the fraud which he supposed to have been established. Let it not be said that here was a divided Court.

ALBANY
Sept. 1823

N. Y. Firemen
Insurance
Company.
v.
De Wolf.

Is a neutral permitted, in contemplation of war, to agree for property, to become vested in him on its arrival in a belligerent port? Or does such a contract vest the property in the belligerent, while it is yet *in transitu?* If either of these questions are determined against us, we must fail. It must be admitted that such a contract would be valid in time of peace, and that the property would remain in the shipper during the voyage. Now I assume it as a well established proposition in the law of nations, that a contract which is allowed to a neutral in time of peace, is also allowed during war, with two exceptions only—where it interferes with the rights of blockade, or relates to articles contraband of war. I challenge gentlemen to find another exception, from Grotius down to the latest writer on the law of nations; nor is it required by policy. Are we to surrender a most valuable branch of trade, without the semblance of reason or authority? So long as we limit ourselves to the rules of international law, we are right—we are safe, and ought to be so. A contrary rule may promote the interest of certain belligerents, but it never can be for our interest, who are generally neutral. Shall we always be bound to fish out the market before venturing upon a contract? Does the previous contract depend entirely upon vigilance in eluding the enemy, and accidently being able to land the property at the port of destination? Does that contract, whatever may be its provisions, destroy the neutral character of the property? Must everything, in relation to the commerce of neutrals, be mere hap-hazard? Beware how you adopt a doctrine so injurious to neutral rights. England and France are at war— a cargo is shipped from a merchant in England to one of our own merchants, who is to remit the proceeds, at his risk, in pot and pearl ashes; but because this is to enrich England, it may be seized and confiscated by France. She condemns the cargo because *it is going to* an English house. This is the length of the doctrine on the other side. It places the neutral on the same footing with the belligerent. Even where property is destined to a blockaded port, it is not, for that reason, to be condemned. You have a right to go

there. If the blockade continue, you are to be warned off, but it is illegal to seize your goods *in transitu*.

This cargo was not contraband. Provisions are not considered so. Contraband is a term well understood by the law of nations, and consists in the munitions of war. But even if contraband, the articles are not, for that reason, always to be condemned by the law of nations. They may be seized, but if the merchant turns out to have been honest, they are to be paid for, or detained and placed beyond the reach of the enemy, and restored when the danger is over. This principle is according to our treaties with Great Britain, France, Spain, &c. But it is enough that provisions are not contraband of war. No doubt Great Britain attempted to make them so, during the late war between her and France. It is for her interest that they should be so considered. Ours is directly the contrary. *The Sally Griffiths*(z) is the first case of a condemnation of provisions *in transitu* ; and there was a contract directly to supply the French army. Provisions were never treated as contraband by the Courts of any other country. I invite this Court to read the opinion of Chief Justice Marshall, in the case of *The Commercen*, so much relied upon on the other side. Two of the Judges agreed with him, and three concurred with Mr. Justice Story. While gentlemen talk of a divided Court, I beg leave to remind them how this Court was divided. Marshall might be placed by the side of Sir William Scott, and yet maintain the dignity of his country. *En passant*, look at the note to that case, (1 Wheat. 391,) exhibiting our treaty with Spain, in which provisions are expressly excepted from among articles contraband, as fixed by the treaty. Even Justice Story decides that provisions are not contraband, but goes on the ground of a direct destination. Ours is called enemy's property. Indeed, any and every ground is taken in the sentence of condemnation, which can give color for confiscating the cargo.

Having argued the case of *Ludlow* v. *Bowne & Eddy*, I am indebted, in part, to my notes in that case for a brief history of the doctrine relied upon, as it exists in the English Courts of Admiralty. Till 1795, there was no decision

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

(z)
Adm.
300, n

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

on the subject. I had searched Marriott's Admiralty Deci sions and found none there. By a note to *The Commer-cen*, (1 Wheat. 389, *n. i,*) it will be seen that the law of France does not consider provisions as contraband, except when destined to beseiged and blockaded places.

Upon a question as to the law of nations, the decisions of France are as high authority with us as those of England. Even upon the common law, the English decisions since the revolution are not binding; and not one of the English de-cisions cited goes upon the law of nations. They merely es-tablish a rule of evidence, and hold certain circumstances, when proved, to be conclusive as a *presumptio juris et de jure.* Upon this rule, certain contracts, like the one under consideration, are holden fraudulent, and made for the pur-pose of covering the property of an enemy. This is the whole extent of the doctrine, as maintained in England.

(a) 1 Rob.
Adm. Rep.
338.

The *Vrow Margaretha,*(a) is the first reported case in which it was advanced. The Court there say, (speaking of it as a rule of evidence,) "When war intervenes, another rule is set up in Courts of Admiralty, which interferes with the ordinary practice. In a state of war, existing or imminent, it is held that the property shall be deemed to continue as it was at the time of the shipment, till the actual delivery. This arises out of the state of war, which gives a belligerent a right to stop the goods of his enemy. If such a rule did not exist, all goods shipped in the enemy's country would be protected by transfers which it would be impossible to de-tect. It is on that principle held, I believe, as a general rule, that property cannot be converted *in transitu ;* and in that sense I recognize it as a rule of this Court." *The Packet*

(b) 2 Rob.
133.

*de Bilboa,*(b) is the next case. In this, Sir W. Scott said, that a contract of sale to an enemy, though made by a neutral, with a provision that the risk should fall on the consignor till the goods came into possession of the consignee, en-titled the captor to consider them as enemy's property.

(c) 3 Rob.
300, in note.
(d) Id. 299.

*The Sally Griffiths,*(c) is the next reported case. Now this was never relied upon till the case of *The Atlas,*(d) in which Scott speaks of the rule as one which belonged to the prize

Courts. *The Sally Griffiths* was in 1795, and is the first case in which the principle can be said to have been established, even in the prize Courts. In *The Anna Catharina*, (e) Scott considered the contract as in truth executory, but executed according to the decisions and rules of evidence which prevailed in the Courts of Admiralty. *The Jan Frederic* (*f*) was the case of a Dutch merchant, who had contracted, in contemplation of war, for the transfer of colonial property, *in transitu*, and the Court lay down the rule as established, that an actual transfer of goods, *in transitu*, to a neutral, though before the war, if in contemplation of it, is illegal. The Court say, that " in time of war this is prohibited as a vicious contract, being a fraud on belligerent rights, not only in the particular transaction, but in the great facility which it would necessarily introduce of evading those rights beyond the possibility of detection. It is a road that, in time of war, must be shut up ; for although honest men might be induced to travel it with very innocent intentions, the far greater proportion of those who passed would use it only for sinister purposes, and with views of fraud on the rights of the belligerent." That is to say, because fraud may be practised, we will cut up all commerce with the enemy. The contract shall·be executed, or executory, according to our purposes. It is such doctrine as this which the court, in *Ludlow* v. *Bowne & Eddy*, reprobate. Your contract may be profitable, executory, and made before the war ; yet, if the property is shipped, it must go. If you insure it as your own, it is anothers, and you must lose your insurance. You can neither sell nor insure. You lose your right of lien. Contrary to your consent, the property is executed in the vendee ; all is at his risk, as his property. It is subject to confiscation, by the rules of a British Court of Admiralty. This is an abominable doctrine, at war with the most sacred principles of international law. Between Great Britain and her colonies we cannot trade in time of peace ; consequently war does not sanction such a trade. This is but another illustration of the general rule which I before laid down, that what is permitted to a neutral in time of peace is lawful in time of war.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

(e) 4 Rob
Adm. Rep
107, & vid. id
114, n. (a)
(f) 5 Rob
Adm. Rep
115.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
·v.
De Wolf.

(g) 1 Gall.
275.

(h) 334 to
340, tit. Prize.

(i) 8 Cranch.
253, 275.

(j) id. 317,
335 and 359.
(k) 1 Wheat.
208, & id. 25.

But we are told that the capture passes the property This is another fancy of Sir William Scott, in direct contradiction to the law of nations. The rule of this law is explicit, that a capture works no change of property—divests no lien. At most, the captor takes the interest of the enemy, subject to all the rights of the neutral.

But we are told that the ship *Ann Green*(g) sanctions the doctrine of Sir William Scott. There is in that case, I admit, a dictum of Mr. Justice Story, in which he speaks of the doctrine in *The Sally Griffiths*, and the class of cases to which it belongs, in the language quoted by the other side. But there is a class of cases in the Supreme Court of the United States, which puts the question at rest. They are collected in Wheaton's Digest.(h) They declare that if the property remain at the risk of the consignor, it is to be deemed his, though otherwise, if at the risk of the consignee. At whose risk, while *in transitu*? is the true question. This is placed, by those cases, on the broad basis of national law. What the Court say in *The Venus*,(i) is full to this point. Their language is that, " to effect a change of the property as between seller and buyer, it is essential that there should be a contract of sale agreed to by the parties; and if the thing agreed to be sold, is to be sent by the vendor to the vendee, it is necessary to the perfection of the contract, that it should be delivered to the purchaser or his agent." *The Merrimack & Frances*,(j) *The St. Jose Indiano* and *The Mary & Susan*,(k) are to the same effect. All these are cases of capture during the transit. So long as the neutral consignor runs any risk whatever, the property is deemed safe. It is not until he has parted with all his control to the enemy, that it puts on the belligerent character. Suppose that in this case there had been no capture and no condemnation, but a loss by perils of the sea—the defence would have been as complete in such an event as it is now; and yet, would there have been any doubt of our right to recover? No. We should then have been perplexed by none of these nice refinements upon international or municipal law. I trust this Court will never look to the English Courts of Admiralty for rules of evidence under the law of nations.

But conceding, for the sake of the argument, that the law
of nations is otherwise than what we had supposed—that
the decisions of the British Courts of Admiralty form the
law of this state—these must yield to the conventional law.
What is the Spanish treaty with this country?    It will be
found in Wheaton's Digest.(*l*) I allude to the Spanish treaty
of 1795.    The principle there recognized is, that free ships
make free goods.    Shall Venezuela be allowed to annul this
treaty ?    She was not an independent nation at the period
of the adventure.    She cannot be considered so by us, until
her independence was acknowledged by our government,
which was not till after the capture.(*m*)    But whether inde-
pendent or not, how far had she a right to do away our trea-
ty with the mother country ?    When this treaty was made,
she was an intregal part of the Spanish empire, and as such
bound by the transaction.    She was a party to the bargain.
In *Gelston* v. *Hoyt*,(*n*) Ch. J. Marshall says, " No doctrine
is better established, that than it belongs exclusively to
governments to recognize new states in the revolutions
which may occur in the world, and until such recognition,
either by our own government or the government to which
the new state belonged, courts of justice are bound to con-
sider the ancient state of things as remaining unaltered."
The question, how far a colony should be considered inde
pendent before acknowledged to be so by our government,
was directly involved in the determination of that cause.
In *Rose* v. *Himely*,(*o*) he says, " It is for governments to
decide, whether they will consider St. Domingo as an inde-
pendent nation ; and until such decision shall be made, or
France shall relinquish her claim, courts of justice must
consider the ancient state of things as remaining unaltered,
and the sovereign power of France over  that colony as still
subsisting."  This point alone is decisive of the cause.

*T. A. Emmet*, (same side.)  This Court have no right,
on a writ of error, to examine questions of jury investigation.
They ought not to forget that the points in this cause arise
upon a bill of exceptions, the object of which is to reverse
the judgment on matters of law.  Is there any case, on a

**Margin notes:**

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

(*l*) 340, and
vid. 2 Wheat.
Rep. 227, 246.

(*m*) *Gelston*
v.  *Hoyt*,  13
John. 361.

(*n*) 3 Wheat.
Rep. 324.

(*o*) 4 Cranch,
272.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

writ of error, in which questions of fact can be decided ? Every thing of that nature must be previously settled, in order to present the dry question of law. This should be by a jury, or a case made by consent, subject to the opinion of the Court below. Such a case, though made without the intervention of a jury, being subject to the opinion of the Court, and passed upon by them, would be equivalent to, and might be turned into a special verdict by the consent of parties. Why did not the plaintiffs in error try the cause in the Court below before a jury ? Because they did not mean to insist on a state of facts differing from that which is stated in the bill. The case was turned into a bill of exceptions. This is the same in effect as a special verdict. A writ of error, on matter of law arising from the evidence, generally comes here either upon a special verdict, finding the facts, or a bill of exceptions upon which the facts are conceded.

This writ of error is duly brought on exception to the Judge's opinion upon a question of law. It finds fault, that he left all matters to the jury, and did not hold them conclusive. And whether this was right is the single point in the cause. Under the Judge's charge, gentlemen had a right to go to the jury upon the question of fraud, or any other question of fact, and ask the Judge to charge upon the points which they had made. They did not do so. What are the matters stated in the bill ? If there were contradictory facts, the jury must have found one way or the other. But in a bill of exceptions, the parties under the direction of the Court, must agree upon conclusions of fact, and they cannot afterwards be questioned.

According to the statement of the bill, we proved the property and loss, and stopped there. We rested upon these circumstances. The other side required no more. They put us upon no other proof. They then take up the cause, go on and make out our case as to property, risk and delivery, and cannot now question it in either of these particulars. They then prove the contract, and our ignorance of the contract made by Levy with the Intendant—that De Wolf purchased the cargo with his own funds ; and yet they complain that we did not prove all this. Upon what ground can

they say that the vessel was laden with Levy's funds ?—that ALBANY, Sept. 1823. De Wolf knew that the cargo was destined for the Spanish Intendant ? and that he delivered the goods to Levy in New N. Y. Firemen Insurance Company v. De Wolf. York ? &c.

In this view of the case, the only question for this Court to determine is, whether the facts stated in the bill were conclusive against us ? Were they a bar to the action ? To decide this is the proper function of the Court.

But examine the facts for a moment. The bill of lading is true. It speaks of the property as belonging to the owners of the vessel. The invoice declares it to be for the account and risk of the shipper. The letters speak of De Wolf's interest—" If for my interest, pass on the vessel to windward." The bill of lading and invoice are strictly true ; and that cannot be called fraud, in relation to which the party is not obliged to speak. Neither in peace nor in war is a merchant bound to make any disclosure that will not affect the national character which he assumes. In peace he is not bound to lay open his mercantile transactions to the world ; nor can a belligerent claim this.

The national character of De Wolf is fully established ; but he did not ship in Levy's name, because by doing so he would have parted with the right of property, surrendered the control of the cargo, and could not have held it to secure the payment of the price ; and there may be a variety of reasons entirely disconnected with peace or war, why the property should not be immediately delivered. He might have dreaded attachments against the cargo, as the property of Levy, at New York, Havana, or any other port into which the ship might have been driven.

That he should communicate the fact that the cargo was designed for the Spanish Intendant, was impossible, because he did not know it. It is said he might have heard so, though he did not know it, and should have communicated his information. But the proof that he did not know it comes from the other side. If construction is resorted to, it should be against the plaintiffs in error ; and, as between knowledge and belief, it should be made to say he had no belief. What

ALBANY,    motive, then, had he for concealment? And without know
Sept. 1823.  ledge or belief there could not possibly be fraud.

N. Y. Firemen    The only imposition of which belligerents can com-
Insurance  plain, is the concealment of national character; and in *The*
Company    *Rosalie & Betty*,(p) this is the exact ground on which the
v.
De Wolf.   Court proceeded. De Wolf, being ignorant of the destina-
(p) 2 Rob. tion of the property, could not, therefore, be intentionally
Adm.   Rep.
343.       aiding the King of Spain. Nor is the destination of the car-
go, for a military purpose, mentioned in the bill of excep-
tions. Even this important fact is left to be made out by
mere inference. The bill does not state that the Intendant
was to have bought the cargo either for the army or the ci-
tizens.

But I deny that provisions are contraband, because they
are sent to supply the army or navy of a belligerent. The
(q) 1 Wheat. case of *The Commercen*,(q) lays down the distinction truly.
Rep. 382.   A neutral has a right to export the provisions of his own coun-
try. If he carries goods bought of an enemy's country, it is
(r) id. 387, 8. otherwise. Story, J. says,(r) that when they are the pro-
perty of a neutral, they may become contraband, on account
of the particular situation of the war, or on account of their
destination. But this is where they do not grow in the
country of the neutral; for he says again, (p. 388,) " An-
other exception from being treated as contraband is, where
the provisions are the growth of the neutral exporting coun-
try. But if they be the growth of an enemy's country, and
more especially, if the property of his subjects, and destin-
ed for enemy's use, there does not seem any good reason
for the exemption." He goes upon the idea that the cargo
was the produce of the enemy's country. As to the produce
of our own soil, nothing short of blockade or siege will pre-
vent its transportation to any part of the world.

What the law of England is, cannot be material. We were
dealing with a Spanish colony. The note referred to in
Wheaton shows the Spanish treaty, and Valin's doctrine.
The treaty is material. It was made in 1795, when Vene-
zuela was a part of Spain. The colony may be separated,
but what law does she carry with her? The laws of the
mother country, unless altered by the competent authority

which is the contracting parties. Such alteration cannot legally take effect, till notice of it is given to those concerned. Venezuela carried with her the old treaty, which continues till altered or dissolved. In *The Nereide,*(s) this doctrine was contended for, and would doubtless have been held, had not the cause turned on the point that the clause in the Spanish treaty was mutual. Until our government acknowledged Venezuela as an independent Republic, and they have broken off the treaty, it continues to apply. What is that treaty? It is important to inquire, because whether contraband or not, when it is made the subject of treaty, ceases to be determinable by the law of nations. By the 16th article(t) provisions are not declared, in terms, to be contraband of war. The only exception in the treaty is a saving of the rights of siege and blockade. The law of nations, then, does not apply. It is said, on the other side, that a trade in provisions is to be restrained, rather than one in dry goods. This is a most pernicious doctrine, especially for the northern states, which abound with provisions for sale. It is contracting the market for our staple productions.

Suppose the cargo to have been contraband. What has this to do with the question? Does it interfere with the warranty that the cargo was American property? May not contraband be American property? The underwriters knew, as well as we, that it was destined to an enemy's port. But it is plain that the warranty must be construed in reference to the Spanish treaty. Conformable to that treaty it was entitled to protection, and the capture was a violation of the treaty. We were bound to know nothing except what was essential to the truth of the warranty. Being ignorant of the destination, this could never affect our right. It is said, here was enough to put us on inquiry, which was equivalent to actual notice. But this doctrine applies only as between two persons, where the vested rights of one are to be overreached. Here was no obligation to inquire. Levy had a right to his commercial secrets and was not bound to make any disclosures.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf

(s) 9 Cranch, 388.
(t) 2 Wheat. Rep. 233, translated there from the Spanish.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf

The bargain was not contrary to the law of nations; and the rule, as laid down by the Courts of English Admiralty, does not reach it. There the property, on landing, must belong to the enemy, or it will not be deemed enemy's property while *in transitu*. Here the cargo was to belong directly to a neutral. The English rule is always laid down with a qualification in favor of this case. Besides, the rule itself has no foundation in the law of nations, and is not justified by any thing in this country, except the *obiter dictum* of Mr. Justice Story, at the beginning of the war. I mean nothing disrespectful to Judge Story, but he has studied admiralty law under Sir William Scott, and will find it necessary to change his doctrine, should the country remain neutral. But the rule, at most, is merely a rule of evidence in the prize Courts—a *presumptio juris et de jure* as it is called in *Ludlow* v. *Bowne & Eddy*. In the two admiralty causes which were first cited, (*The Atlas* and *Sally Griffiths*,) the decision may have been right, because they were both cases of fraud. The property was to become that of the French government. The doctrine is called a rule of the prize Courts. The Court said, "It has always been the rule of the prize Courts, that property going to be delivered in the enemy's country, and under a contract to become the property of the enemy immediately on arrival, if taken *in transitu*, is to be considered as enemy's property." As to the Atlas, the cargo was bargained and sold to the French government, and was to have been delivered at the risk of the captain; and might, for that reason, have well been considered a case of collusion. These cases, then, establish merely that where enemy's property is sought to be covered by neutral names, it is a fraud upon belligerent rights, and the property may be condemned. But not one of them applies to a case where the property, as here, was to become that of a neutral.

A collusive sale to an enemy, is punished by the law of nations, because the property vests in a belligerent; but the rule itself presupposes, that neutrals are to be protected by the law of nations. They are the peculiar objects of protection by that law, and when there is a doubt whether

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

neutral or belligerent rights are to prevail, the presumption is in favor of the former. This is for the peace, and consequently, for the general good of mankind. The only exceptions are blockade, siege or contraband. With these exceptions, a neutral may pursue the same trade in war as in peace. England says this, though she has not gone upon presumption in favor of neutral rights. We all remember her rule of 1756, ( 1 Wheat. Rep. app. 507,) which shut out all intercourse during war, which was forbidden in time of peace. But you are asked to reverse the rule, and go beyond England in severity: to deny that trade in war which was fully open in peace. The reasons given for this, are two: 1. That a contrary rule will put an end to capture; and, in the language of Mr. J. Story, (1 Gall. 291,) "not a single bale of enemy's goods would ever be found upon the ocean." I see no great evil in this. It is diminishing the calamities of war ; and the opposite argument interferes directly with neutral rights : 2. Decisions are relied on, that the capturing belligerent, may substitute himself for the belligerent proprietor. There are cases of this kind. They are spoken of in the *Packet De Bilboa.*(u) Sir William Scott, speaking of property shipped in time of war, at the risk of the neutral shipper, at first calls the contract *invalid ;* but afterwards he retracts and says, " It is rather a contract, which if made in war, has this effect; that the captor has a right to seize it and convert the property to his own use ; for he having all the rights that belong to his enemy, is authorized to have his taking possession considered as equivalent to an actual delivery to his enemy." The conclusion, then, is, that the contract is valid ; but the captor may be substituted for the vendee. Taking this reasoning in its greatest force, the captor can acquire no greater property than the vendee, who has none till delivery. The premises of the Judge do not bear out the conclusion. The captor may have all the rights of his enemy, without a delivery. This is like the case of capturing enemy's property on freight in a neutral vessel. There it is just, except in the single case, where free ships make free goods, as they do by the Spanish treaty.(v) Coming in thus, the captor took *cum onere ;* and

(u) 2 Rob Adm. Rep 133.

(v) 2 Wheat Rep 231, n b.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

must pay on capture, as Levy was bound to do on delivery. When the commerce is lawful, how can the captor defeat any part of the contract?

In *Ludlow* v. *Bowne & Eddy*, the Supreme Court do more than to repudiate the law of the English Admiralty. They give full effect to the condition precedent, although the property was to go directly to the enemy. In this case as we have already remarked, the property was bargained to a neutral. As far as De Wolf knew, Levy had a right to make a contract of sale in any of the enemy's ports. The difference of opinion in *Ludlow* v. *Bowne & Eddy*, arose upon the question whether the contract was not intended as a mere cover to the property, which might well admit of doubt. Here is no room for such a doubt.

It is said that the cargo vested in Levy at New York or Havana. This goes directly to the question of interest in De Wolf. It has never before been urged in this light, or treated as an objection to the interest of the assured, and cannot be used as such here. The reason given why the cargo vested in Levy at New York, is the fanciful one that a delivery to the captain is a delivery to the consignee. But this is true of a general ship only, where the captain is considered an agent of the consignees. In this case he was De Wolf's agent. Every consignment is open to explanation by the conduct of the parties; and was so treated by Thompson J. in *Ludlow* v. *Bowne & Eddy*. The law of nations on this subject, is the same as the municipal law.

(w) 8 Cranch, 253.
(x) Id. 275.

In *The Venus*,(w) Washington, J. says,(x) "The delivery of the goods to the master of the vessel was not for the use of Magee & Jones, any more than it was for the use of the shipper solely ; and consequently it amounted to nothing so as to divest the property out of the shipper ;" and in *The*

(y) Id. 418.

*Frances*(y) he says, " when goods are sent upon the account and risk of the shipper, the delivery to the master, is a delivery to him as agent of the shipper, not of the consignee."

(a) 1 Wheat. Rep. 208.
(b) Id. 212, 113.

In *The St. Jose Indiano*,(a) Story, J. lays down the same doctrine. He says,(b) that " in general the rules of the prize Court as to the vesting of property, are the same with those of the common law, by which the thing sold, after the com-

pletion of the contract, is properly at the risk of the purchaser. But the question still recurs ; when is the contract executed ? It is certainly competent for an agent abroad, who purchases in pursuance of orders, to vest the property in his principal immediately on the purchase. This is the case when he purchases exclusively on the credit of his principal, or makes an absolute appropriation and designation of the property for his principal. But where a merchant abroad, in pursuance of orders, either sells his own goods, or purchases goods on his own credit, (and thereby, in reality, becomes the owner,) no property in the goods vests in his correspondent until he has done some notorious act to divest himself of his title, or has parted with the possession by an actual and unconditional delivery for the use of such correspondent. Until that time, he has, in legal contemplation, the exclusive property as well as possession ; and it is not a wrongful act in him to convert them to any use which he pleases. He is at liberty to contract upon any new engagements, or substitute any new conditions in relation to the shipments." These authorities go to prevent a divestment in case of a general shipper. They show conclusively, that the property does not pass from the shipper till some notorious act of delivery.

There was no delivery at Havana. It is true that a symbolical is equal to an actual delivery ; but to make it symbolical, there must be an intention to change the property. Any act done by Hernandez & Chavitau, at Havana, unless intended to operate as a delivery, cannot be considered so. What they did was rather a refusal to accept. The endorsement on the bill of lading is plain evidence of such a refusal. The brig was ordered to proceed under a right reserved in the contract. Hernandez & Chavitau did not obtain the entire control of the vessel. Could they, for instance, have ordered her to any other port than Laguira or Porto Cavello ? They were the agents of Levy, for the purpose of ordering the property to proceed ; and, from necessity, the agents of De Wolf for changing the papers so as to give it safety. If not agents, they did a wrongful act ·

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

when they interfered with the cargo. Could such an act divest De Wolf of his property ? At whose risk would it have been, had the vessel been lost by perils of the sea between Havana and Laguira ? Could De Wolf have maintained an action against Levy for goods sold and delivered ? If not, the cargo was De Wolf's during its transit.

Another ground taken on the other side, shows the great difficulty which exists with the gentlemen themselves, in determining when or where any delivery took place. They, at last, press to their aid the fanciful idea of Sir William Scott, that the capture was a delivery. Now, if this was so, the loss was *eo instanti* with the change. The property continued in De Wolf the whole time, up to the moment of the capture ; and the warranty is satisfied.

But we are told that the risk was increased by circumstances which were not disclosed. Is not this a point which should have been passed upon by the jury ? They have not been asked to do this ; and no such fact is admitted by the bill of exceptions. What evidence is there to justify such an inference? To defeat a policy, the alleged concealment must be fraudulent.(c) But there is, in truth, no evidence either of concealment or fraud. Nor is it true, that every thing increasing the risk should be communicated. If covered by a warranty, it need not be disclosed.(d) In Park, 229, (301 of 6th ed.) it is said " there should be a representation of every thing relating to the risk which the underwriter has to run, except it be covered by a warranty." *Haywood et al.* v. *Rogers*,(e) was a case where the assured of a ship had received a letter from his captain, informing him that he had been obliged to have a survey on the ship at Trinidad *on account of her bad character*. But the survey which accompanied the letter, gave the ship a good character ; and though it appeared in evidence, that such circumstance, if known, would have enhanced the premium, yet the Court held a communication of this unnecessary, because it was covered by the implied warranty of seaworthiness. Doubt concerning the ownership alone, could, in this case, increase the risk ; and this was covered by the warranty of American property.

(c) *Williams*
v. *Delafield*, 2
Caines' Rep.
329.   *Urbin
Duguit*   v.
*Rhinelander*,
2 John. Cas.
476.
(d) 1 Marsh.
on Ins. 475,
per Ld. Mansfield.
(e)   4 East,
590.

ALBAर ए,
Sept. 1873.

N. Y. Firemen
Insuran, ल
Compar,ए
v.
De Wol्.

Again; the interest of De Wolf must have made a part of the preliminary proof; and, indeed, the proof on the trial. The only thing which he could have communicated, was his bargain with Levy, that the latter should receive the cargo at Havana. This could not increase the risk; for both parties were neutrals. The sentence of condemnation goes upon the ground that the property was De Wolf's when it left New York; and that there was a fraudulent attempt to cover it as Spanish property, after it left Havana, by persons over whom De Wolf had no control. But it is enough that the underwriters knew the destination of the vessel. De Wolf had a right to suppose that the Spanish treaty would be observed; and therefore was not bound to make any farther communication of facts which might increase the risk, even though they had not been covered with the warranty.

*S. Jones*, in reply. It appears to me that in the multitude of discussion, the great features of the controversy have been overlooked. The real question is, whether the underwriters are bound to pay for captured property, warranted American, shipped and expressly destined to a Spanish port, at war with the colonies of Spain; and under a contract of sale to the King of Spain. Being under a contract with the Spanish Intendant, the agent of the King of Spain, to supply him with provisions, Levy, in furtherance of this view, treated with De Wolf (among others) for articles deliverable at the port of Havana, Cavello or Laguira; Levy to pay for the cargo, with 5 per cent. on the invoice price, and the premium of insurance. Is not this a mere contract of purchase and sale? Suppose De Wolf to have had the property then in his store, what feature is there in this transaction which does not strongly show a contract of sale? The parties fixed on the price, the delivery in the West Indies; and De Wolf was to procure insurance at Levy's expense. Surely the cargo was transported at the expense of the real owner. If De Wolf's, it must have gone at his expense; If Levy's, at his. The latter was at the entire expense. He contracted to pay the freight.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

The contract divides itself into two parts: a contract of sale, and a contract of carriage. The Court ought to make the separation. Levy said, " I buy your goods, and charter your vessel to carry them." Accordingly, at the close of the contract, there is an allowance for demurrage, or running days, a clause decisively characteristic of a charter party. De Wolf said, " I will carry your goods." Then, I ask whether the delivery to the master did not complete the transaction? Gentlemen say that no sale is complete, till a delivery. Is this true in the sense contended for? Is it true that goods sold and shipped by a merchant abroad do not vest till an actual delivery at the port of destination? What is more usual than a consignment and delivery to a master, placing them at the risk of the master during the whole voyage? There is not one word in this contract fixing a condition to the delivery. The bill of lading imports an absolute delivery at Havana. Was not the master bound to deliver unconditionally, if Hernandez & Chavitau had required it? Had not Levy and his agents the unqualified control? Yes. Levy had placed the goods beyond the power of the shipper. The letters place them under the orders of Hernandez & Chavitau; and payment on delivery is not talked about in any of the documents. The cases cited on the other side, from Cranch and Wheaton, then, have no application. They relate to express clauses in the bill of lading and consignment, fixing the condition upon which the delivery was to take place. Parties have a right to make such contracts as they please; and they have so framed this, that it is executed from the beginning.

It is said the finding of the jury estops us to say, that the contract was absolute. It is only through some technical objection, some net work, such as this, that gentlemen can escape. This case is truly stated in the 20 Johnson, 214. The form of the case made it necessary that most of the evidence should be stated as coming from us. The preliminary negotiation is first stated; and the attempt is to infer the executory nature of the contract from this. But the true question is, what was the result? A sale of goods to be

paid for at Havana? No. The case states that the agreement was contained in the letters. To these alone are we to refer in order to determine what the contract was. What rule is better established than this: that let the negotiations be what they may, they all resolve themselves into the final agreement. *Vandervoot* v. *Smith*, (*f*) excluded a written negotiation, which clashed with that part of the contract relating to the voyage insured. That will be found a stronger case in favor of receiving the negotiation than the present one. The contract here is silent as to the time and place of payment. If De Wolf ever entertained the idea of payment at Havana, he gave it up. Indeed, such an idea is contradicted by every argument in the case. Did you ever hear of a payment to be made at the port of delivery, where there was not one word said about it in the contract? On goods thus arriving to a consignee, could he not compel the captain to deliver them, without paying him one cent? Levy was to have sent the vessel home on freight. Would a merchant, who is to receive pay at a foreign port, direct his vessel to return on freight? Would he not have ordered a return cargo? In this case, if a return cargo had been purchased, it was to have been paid for by bills on De Wolf. And even the ordinary expenses or disbursements of the vessel are to be paid in the same way. Then where was the cargo to have been paid for? No where. It *had been* paid for or secured, in New York.

If, then, there was no condition attached to the delivery, the property was changed on the shipment. This settles the question of American property. The warranty was violated; for the cargo insured was Danish. In regard to personal property, an unqualified right to compel a delivery from the vendor to the vendee, is a delivery. The property passes. Security to pay, at all events, is the same as actual payment. No matter what day is fixed, the goods are not responsible for the payment. If payment had not been made; if it was to have been reserved, till the result of the adventure should be ascertained; if there was a right in De Wolf to detain the property at Havana, till actual payment, what is easier than for him to have shown these facts

ALBANY
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

(*f*)   2
Caines'   R p.
155.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v
De Wolf.

at the trial? The letter to Captain Pratt was signed by a confidential clerk, a competent witness, who could have been produced with the greatest ease, and who doubtless knew whether there was a payment or not. There was ample time between the contract, which was on the 21st of July, and the time when the vessel sailed, (the 4th of August,) for the parties to have changed their minds. A conditional obligation to deliver is wholly inconsistent with the circumstances, which should have been explained by evidence on the part of De Wolf. The only consignees were at Havana. They were to receive the cargo, or send it on to their own agent, over whom De Wolf had no control. Hernandez & Chavitau were the agents of Levy alone. They acted under instructions previously given to them by him, in relation to this, among other business of his, arising out of his contract with Spain. Thus, the loss happening at any time after the vessel left New York, from whatever cause, would have been Levy's loss; and it is immaterial in what point of light the vesting of the property in him is viewed; whether as a want of interest in De Wolf, under the policy, or a violation of the warranty. Take it which way you will, the result is the same—the policy is void.

As a further proof that the property was not intended to be deliverable at Havana, the captain knew nothing of any such intention, as is apparent from his examination before the Court of Admiralty. It could not have been inferred from the invoice. If the price was to have been a lien, would it not have been so marked upon the bill of lading? It is singular that it should have been the duty of the captain to retain the cargo till the price of the bill of lading should be paid, and yet that he should have no instructions on the subject.

But, at any rate, were not the acts done at Havana an execution of the contract? It is insisted that the captain was to keep De Wolf's property, as his agent, and not as captain of a general ship. For the purpose of delivery, a bill of lading makes a general ship. It is not material whether the master was the agent of De Wolf or not, if no act was to precede the delivery. Where the vendor ships goods, though

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

by his own vessel, it is a general ship, and the goods pass to the consignee by a delivery to the captain. If the ship be chartered, the vendee is owner *pro hac vice.* At Havana the captain tendered himself to the consignees, as in duty bound to do, and they accepted the cargo, and ordered it on to Porto Cavello. They gave new orders of their own. Could De Wolf have then gone to the port of final destination, and there have arrested the goods as a security for payment? No. The ulterior consignee would have told him that even his right of stoppage *in transitu* was gone.

But it is said that the consignees had an election to receive the goods at Havana, or refuse, and order them on. Havana, then, was the port of election, where an election was in fact made by Levy. But his interference was, in truth, a mere control over De Wolf, as his carrier, and all he could have done, in case of De Wolf's disobedience, would have been to sue him for not going on. De Wolf could not have rightfully detained the property. Yet although it passed, it was all important to keep this out of view; and appearances are no argument against the secret truth. By concealment the parties were enabled to insure at a less premium. The cargo was more safe from the cruisers, and accordingly every letter is made to bear De Wolf's name.

The papers were false. The goods are called " owner's property." They are spoken of as " paying no freight," and the letters talk of sending the cargo on, *if it should suit De Wolf's interest*, when in truth he *had no interest*, and freight *was to have been paid.* In one letter he affects to treat it as a sale on his own account, and at his own risk. The sequel was a destination to Havana, " or a market," and the first consignees wrote a letter to the new ones, that the property belonged to " their friend in New York." It is asked, why did Levy use De Wolf's name instead of his own? Probably because he was known as the agent of the Spanish government.

But suppose it to have been intended that the cargo should all along continue in De Wolf, as owner. It is then material to inquire what effect such a shipment as this had upon the property. It was, under Levy's orders, deliverable to him

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

(g) Per Chace,
J, 3 Dall. 224.
(h) 13 Niles,
Reg. 236.
(i) United
States v. Pal-
mer et al., 3
Wheat. 610.

as the agent of Spain, during a war between that country and Venezuela. Could such a contract protect a cargo thus situated? It was shipped to the Spanish government; and I assume that it was destined to a Spanish army or navy. If it is necessary to show that war in fact existed, I refer to the authorities already cited, and to show that it was a lawful war, I refer to the declaration of independence by the Republic of Venezuela. Did not this make it an independent nation? Will Americans hesitate what answer to give to such a question? A people who have been trained to believe that their own declaration of independence separated them from the mother country as effectually in a political, as the Atlantic ocean does in a physical capacity? This opinion, too, has the sanction of our national judiciary,(g) and our national executive,(h) as we have already shown. Our Courts are to be guided by the views of the latter,(i) who considered Venezuela an independent government, at open war with Spain. The destination of this cargo was to parts of the country held by the enemies of Venezuela. Can this be the case, and yet a claim that it should be protected as neutral property, be tolerated? While the neutral is protected, you will not carry the doctrine so far as to destroy the rights of belligerents. Policy does not require it. We may yet be belligerents. An armed neutrality will not be found to answer the purpose, whatever may be our power. The civilized world have failed in such a project. We were lately belligerents, and while so, we found the exercise of belligerent rights necessary for our protection; and they were then fully recognized by our Courts. It is said that a trade allowable in time of peace is so during war. This we deny. Suppose you were invaded—would you allow a neutral to supply the enemy in your face? Substitute Venezuela for the United States, and the case supposed is the one under consideration.

The English rule is broad. It subjects property to capture, which will become enemy's property on its arrival at the port of destination. Of this there is no doubt; and giving the defendant in error his own ground, as to the nature of the contract, this rule is against him. It has been treated as a violation of the law of nations. It is not necessary for

me personally to vindicate Sir William Scott. All that is necessary in his vindication will be found in the decision of our highest Courts. The Court have already been referred to the language of Story, J., and during the late war almost every principle advanced by Sir William Scott, was recognized by our own Courts. These are rules, it is true, which apply with emphasis to the prize Courts : and I am not aware that we can go elsewhere to determine what is the law of nations in relation to capture. What other jurisdiction is there to determine the question of neutrality, and its effect ?

The meaning of the warranty is, that the property is American throughout the voyage, in reference to the belligerent parties. In *Vos & Graves v. The United Insurance Company*,(*j*) Radcliff, J., says, "It is a settled rule, that the insured, in order to comply with his warranty, must not only maintain the property to be neutral, but so conduct himself towards the belligerent parties, as not to forfeit his neutrality. He must pursue the conduct and preserve the character of a neutral."

The warranty was intended as a protection against a belligerent state. What is the law of nations on the subject of contraband, as settled by our own Courts, aside from either Scott or Story? *The Commercen*(*k*) goes the whole length of Sir William Scott's doctrine. It goes upon the law of nations—not local prize law, as supposed on the other side. It has also been said, that the reason of this case was, that the property in question did not grow in the country of the shipper ; but in one part of the opinion, the case of provisions, generally, is put, without regard to their growth or production, and they are considered indiscriminately as subject to the same rule. It has been said, that the judgment was given by a divided Court, and a just eulogium was pronounced upon the Chief Justice, who, I aver, did not dissent from the principle of the case. His opinion goes upon the particular circumstances, and that this country ought not to interfere between England and Spain. He says, "'The second ground taken is, that the carriage of supplies to the army of an enemy is to take part with him in the war,

ALBANY, Sept. 1823.

N. Y. Firemen Insurance Company v. De Wolf.

(*j*) 1 Caines Cas. Err. 7.

(*k*) 1 Wheat 382.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

and consequently to become the enemy of the United States so far as to forfeit the right to freight." And when he comes to speak of this point, he says, " That a neutral carrying supplies to the army of the enemy, does, under the mildest interpretation of national law, expose himself to the loss of freight, is a proposition too well settled to be controverted ;" thus expressly recognizing the ground taken by a majority of the Court. The neutral forfeits the right to freight—as heavy a forfeiture as a neutral can be subjected to. As to this country, the party was a neutral ; and wherever a neutal loses his freight, he would lose the property, if his own. Not one exception to this rule can be found.

It is said that *Ludlow* v. *Bowne & Eddy* decides this case ; but it is distinguishable in all its important features. Payment was made a condition precedent to the delivery, and the Judges put the case on that ground. That was a shipment of general merchandize—not provisions—and (what is a very important distinction) it was a shipment to a private citizen. One shipping to the government is identified with that government. By its destination, the property ceased to be American, whether De Wolf knew of the purpose or not. He undertook, not only for his own acts but those of his agents and consignees. Suppose the vessel had unlawfully entered a blockaded port ; this would have been a violation of the warranty, as perfectly as if done under the immediate direction of De Wolf. This was not a delivery to a neutral Dane. He was the agent of Spain, and must be affected by the Spanish character.

But we are told that Venezuela was bound by the Spanish treaty. If so, perhaps she had no right to condemn. The treaty was made in 1795, and recognizes the principle that " free ships make free goods ;" but it goes on to except from this provision goods which are contraband of war. Was not this cargo, destined to feed the Spanish army, contraband within the exception ? But Venezuela was not bound by the treaty. She had become independent—broken all her relations with the Spanish Crown—assumed self-government—and no political relations, existing before the change, can bind her. She is bound by the law of nations, but no-

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company.
v.
De Wolf.

thing more. The treaty was a contract made with Spain. Suppose one party to a treaty loses its political existence—suppose it reduced to the dominion of another—the treaty is gone as to the country subjugated. The same principle applies in the present case. The cases cited to this point, on the other side, relate to St. Domingo, the existence of which, as a nation, it is well known, our government never would recognize. The message of the President, to which the court have been referred, shows the contrary as to Venezuela. She was at war with Spain, and has maintained her independence. An acknowledgment now would relate to her declaration of independence. We have ministers at almost every Spanish province in the South ; and we have, in terms, acknowledged them independent.

It would be, as supposed, immaterial what occasioned the loss, if the property passed at New York. The plaintiff below could not recover. If it did not pass at New York, then we say its American character was lost, from the relation which it bore to another nation. The warranty is prospective, like a warranty that a ship shall not sail before a certain day ; and though a violation of the latter warranty would have no effect in producing a loss by the perils of the sea, yet it would discharge the underwriters. The substitution of a captor to the rights of his enemy has been treated as new law ; while, in reality, it is as old as captures, and will not admit of a question. True, it comes back to the same question ; because we must first determine the capture to have been lawful. This was fully justified by the circumstances. These making out a case of fraud, the property may be considered as enemy's, or as contraband of war. The fact that it was condemned for want of proper documents, was in itself a violation of the warranty.

The argument, that the character of contraband is not a violation of the warranty, is answered by another part of the policy, which contains a warranty against any loss in consequence of seizure, "for or on account of any illicit or prohibited trade, or any trade in articles contraband of war." The Vice-Admiralty take the ground, expressly, that this cargo was made up of prohibited articles, and that they were so, in fact, has been abundantly shown.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company.
v.
De Wolf.

The question of fraudulent concealment, we are told, be-longed exclusively to the jury. Admitted ; so far as it was a question of fact. But it is a mixed question of law and fact. We have all the facts found which we require to make out the concealment, to put De Wolf on inquiry, and charge him with notice of the unlawful destination of the property. It is said that this was covered by the warranty, and therefore we cannot complain of concealment. If so, it is indeed true that we want no more. Either view will equally answer our purpose ; and we contend for it as a fraud, merely because we understood gentlemen to say, at one time, that fraud would not be a violation of the warranty. The risk was increased by the fraud. In the prize Courts, every suspicious circumstance is greedily seized upon as evidence ; and every act of disguise is justly considered a cause of suspicion. Nor let it be supposed that the increase of premium was to pay for the risk arising from this circumstance, from Havana onwards. It is well known that these seas abounded with pirates, which was a very good reason for enlarging the premium, independent of the war.

*Emmet*, here mentioned that in *Vandervoort* v. *Smith*, which had been cited in the reply, it was decided merely that parol evidence shall not be received to contradict the policy. But he said, there is no case in which a contract may not be explained, or supplied by previous negotiations between the parties, in a particular wherein it is silent.

As to the new supposition which had been started that the payment for the cargo might have been *secured* in New York, he said this would leave the matter just where it was before. There would still be a lien on the goods for payment, notwithstanding the security

THE CHANCELLOR. 1. Did De Wolf withhold from the insurers any fact increasing the risk insured ? The case does not show, otherwise than from the policy, what representation of facts was made by De Wolf to the insurers ; nor is it stated that he communicated, or that he withheld, any particular fact. But it has been assumed, that the con-

tract between De Wolf and Levy, was not disclosed; and it is urged, that this contract should have been made known to the insurers. I do not perceive that this contract enhanced the risk. This contract does not show, that the government of Spain, had any concern in the transaction. De Wolf was ignorant, that the cargo was destined for the use of that government; and Levy was a Danish merchant. Had this contract been exhibited to the insurers, they would have learned from it, the rights of Levy and De Wolf against each other, and that Levy, a neutral was to become the proprietor of the cargo, at the port of delivery, after the insurance would cease. These circumstances, did not expose the cargo to any peril, which can be perceived, as an obvious, or ordinary result from such facts; and the contract, therefore, seems not to have varied the risk, in question. It is not found, as a fact, that the risk was increased, by this contract. This question, so far as it is one of fact, was open to proof; and so far as it is a question of law, we are not at liberty to say, that a contract valid by our law and the law of nations, enhanced the risk insured.

2. Was the cargo American property, according to the stipulation of the policy?

Payment for this cargo was to be made by Levy to De Wolf, on its delivery, at Havana, Laguira, or Porto Cavello. This appears distinctly, from the negotiation which preceded the written contract between the parties. The letters forming the written contract, are silent in respect to the time or place of payment; and this omission of a matter so important, is somewhat mysterious. As the case stands, we must either take the verbal agreement upon this point, or proceeding upon the written contract, we must supply its silence by the general conclusion, that where no time of payment is stipulated, the price of the thing sold, is to be paid, on its delivery to the purchaser. It must, accordingly, be taken as a part of this case, that payment was to be made by Levy to De Wolf, when the cargo should be delivered at one of the three ports. This being so, the case before us, is the ordinary contract, by which the vendor, engages to deliver the thing agreed to be sold, at a future time, and the purchaser

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

Cargo was
American pro-
perty.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

engages to pay the price, when he shall receive the thing purchased. In such a case, the property in the thing, which is the subject of the contract, remains in the vendor, until the delivery. The present case is, in this respect, exactly like that of *Ludlow* v. *Bowne & Eddy*, 1 John. 1. In that case, the Supreme Court held, that goods shipped in circumstances like these, remained the property of the consignor until their delivery; and I entirely approve that decision. The reasons of the Supreme Court, in support of its decision, in that case, are a sound and just exposition of our own law, and the law of nations.

The transactions concerning this cargo, at Havana, did not change the property. It is not stated that Hernandez & Chavitau were subjects of Spain; but such they probably were; and I assume the fact, as it has been assumed in the argument. Hernandez & Chavitau were mere agents. They were the agents of Levy, to accept for him, the cargo at Havana, or to decide for him, as he had a right to decide, that the cargo should proceed to one of the other ports; and they were the agents of De Wolf, to direct the master of the vessel, to proceed. They decided for Levy not to receive the cargo, at Havana. They directed for De Wolf, that it should proceed. They did nothing beyond the scope of their powers; and De Wolf continued the owner of the cargo. The result is, that the cargo was the property of De Wolf at the time of its insurance, during the voyage, and at the time of its loss; and consequently, the warranty of American property, was fulfilled.

No fraud subjecting cargo to condemnation.

3. Was there any fraud justly subjecting this cargo to condemnation? This inquiry, and the last, concerning the due performance of the warranty, are in effect, nearly the same; but for the sake of distinctness, they are thus stated. Considering the cargo as belonging to De Wolf, it was the property of a neutral, in the war then existing between Spain and Venezuela. But this cargo, though thus neutral, was destined for ports in the possession of Spain, and for the use of its government. These facts did not subject the cargo to condemnation, by the law of nations. The articles composing the cargo, were not contraband of war; and here was

no blockade. The destination to a belligerent country, was perfectly lawful. To say that it was not so, would be to say, that a neutral cannot hold commerce with a country at war. The right of neutral and peaceful states, to carry on commerce with countries at war, excepting in contraband articles, and excepting with places in a state of blockade, is perfect and unquestionable. If monarchs have sometimes decreed, and if Judges of prize Courts have sometimes declared, that the mere destination of neutral property to the country of their enemy, shall subject it to condemnation, they have abused their power, and have violated a fundamental principle of the law of nations. It is the duty of all courts of justice, and of all nations, to resist an encroachment so unjust, so subversive of the rights of peace, and so unnecessary to the rights of war. The cargo in this case, was to be delivered to Levy, at one of the three ports, and was to be by him delivered to the Spanish government. In this, I perceive nothing forbidden by the law of nations—nothing which deprived the cargo of its neutral character, during the voyage—and nothing of fraud. A government at war, may, like any of its subjects, contract to purchase the property of neutrals, when the articles shall be brought into its own dominions; and a neutral may contract to deliver his own goods in a belligerent country. The question which may always arise in such cases, as it arises here, is, whether the contract is a fraudulent disguise, to give to the property the character of neutrality, during its transit, or not—whether the property, in truth, belongs to the neutral or to the enemy. The principle of the law of nations, laying out of view the case of contraband articles, and the case of places actually invested, is, that the property of a neutral in its passage to a country at war, is free, and that the property of the adverse belligerent, is subject to capture and forfeiture. There are, in general, strong motives to place all property destined to a country at war, under the guise of neutrality ; and these motives are powerful, in proportion to the prospect of gain and the danger of loss. Hence contracts, documents, and formal transactions bearing the utmost appearance of verity, are often contrived, to conceal

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

Rights of neutrals to carry on commerce considered.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

the property of an enemy, under the mantle of a friend. If belligerents commit violence, neutrals commit frauds; and the rights of war, as well as the rights of peace, must be maintained. Courts before which these questions occur, therefore, have and must have, power to penetrate the secret truth of the question, whether the property is, in good faith, neutral or not: and it must always be a question, in each particular case, whether the garb of neutrality, is genuine or fictitious, real or collusive.

Agreement that property shall remain in neutral till delivery, lawful.

In this case, the cargo was certainly neutral, when De Wolf and Levy were about to make their contract; and it probably, comported with all their views, that it should remain neutral, until its delivery at one of the three ports. There seems to have been no sufficient motive on the part of either of them, for any disguise of the real ownership. They were at liberty, to agree, that the cargo should remain the property of De Wolf, until its delivery at Havana, La-guira or Porto Cavello; and they did so agree.

The real facts are certainly, in some degree, disguised by the bill of lading, the letter of instructions from De Wolf to the master, and the letter from De Wolf to Hernandez & Chavitau. These documents were prepared, several days after the insurance; and the bill of lading, at least, went in the vessel. The bill of lading, stated no destination beyond Havana: the letters are silent respecting any delivery at Laguira or Porto Cavello; and they indicate, that the disposition of the cargo at Havana, either by receiving it there, or by sending it to another port, was to be on account of De Wolf. So far as these documents are silent, in respect to any matter which the parties were at liberty, to insert in them or not, the omission is neither extraordinary nor culpable; but so far as they represent that the cargo was to be disposed of, on account of De Wolf, and for his best advantage, they are untrue, according to all the other facts in the case. This representation exposes the case to some suspicion; but it cannot outweigh the force of all the other undisputed facts.

Not a disguise of Spanish property.

Upon all the facts before us, this was not a fraudulent disguise of Spanish property, under the name of De Wolf

It may be a case of some suspicion; but no fraud is proved; and no satisfactory conclusion of fraud can be derived from the facts. To adjudge this transaction, fraudulent, would be, to substitute suspicion and presumption for proof, in a case where no adequate motive for fraud appears, and where no fraud has been found by a jury.

My opinion is, that this cause has been rightly determined by the Supreme Court.

ALBANY, Sept. 1823.

N. Y. Firemen Insurance Company v. De Wolf.

BRONSON, Senator. This was an action brought by De Wolf, in the Court below, to recover 20,000 dollars, insured by the defendants below, The New York Firemen Insurance Company, on the cargo of the brig George Washington laden at New York, with liberty to discharge at Havana, Laguira or Porto Cavello, the premium being regulated according to the length of the voyage, and the number of ports visited.

*Case stated.*

This cargo was purchased and shipped under a contract with Moses E. Levy, of St. Thomas, deliverable at either of the above ports, as he might elect; and the price of freight regulated according to distance. It was captured between Havana and Laguira, and condemned as Spanish property. This Levy turned out to be an army contractor, and intended the cargo for the Spanish troops.

The important question is, whether this was American property; it being warranted such, by the assured: and here it may not be improper to remark, that, as warranties form an important part of these contracts of insurance; and, from their nature, the assured only can know the truth or falsity of them, the interests of commerce, as well as public justice, require that they should be strictly performed.

*The question. Insurance warranties should be strictly performed.*

In the present case, if the cargo belonged to any one other than an American, it constituted a good defence to the action. It is of no importance, therefore, whether it should prove to be the property of Levy, the Dane, or of the Spanish government; for, although in the first case (it being still neutral) the risk would not be increased, yet the underwriters would, in either event be discharged. The contract would be void *ab initio.* De Wolf having, in the out-set,

*If cargo not American, policy void.*

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

But it was
American.
And why.

Objections.

Obviated.
Unimport-
ant when, how
where    pay-
ment was to be
made.

violated the contract on his part, no risk was ever under-
taken by the insurers.   But a careful examination of all the
facts and circumstances, attending this case, has brought
me to the conclusion, that the cargo, when captured, was
American, according to the terms of the warranty ; and for
the reasons assigned at length by the Court below :

1. That the title had not vested in Levy, at Havana, he
having refused by his agent, to receive the cargo at that port.

2. It does not appear that De Wolf knew, that it was
ultimately destined for the Spanish troops.

3. His warranty superseded the necessity of disclosing
to the underwriters, any circumstances in relation to the
national character of the property, or the transactions of the
voyage.

It remains to reconcile some of the circumstances attend-
ing this transaction, which have been urged by counsel
against the American character of the property, with the
above result.  I shall do this, without inquiring whether
these are matters which should have been referred to the
Court and jury below, as contended upon the argument.

The circumstances urged with the most plausibility and
effect are,

1. That no payment was to be made, on the delivery of
the cargo in the West Indies ; and hence the inference, that
it was paid for in New York, and became the property of
Levy at that place :

2. That Levy exercised acts of ownership, in controlling
the property at Havana by his agents ;

3. The false and deceptive instructions relative to the dis-
position of the cargo given by De Wolf to Hernandez &
Chavitau ; and by them again to their agents at Laguira
and Porto Cavello.

It does not appear to me important, when, how, or where
the payment was made.  The parties might arrange that to
suit their interest or convenience, without affecting the
character of this property.  Levy would have been legally
bound to pay for the cargo, freight and insurance, whenever
proof should have been furnished of the safe delivery ac-

cording to contract; and if, in the meantime, he should have advanced for a part, or the whole amount of the cargo, he would be entitled to recover back the advance, on the failure of De Wolf to fulfil on his part. Beside, from the nature and terms of the contract, De Wolf would not be likely to have received payment in the West Indies, unless it were in bills of exchange ; for it seems his first wish was to procure a freight for his brig ; and he did not expect, therefore, to require his own funds to load her ; and the insurance of his money home, would probably have cost nearly as much as that on the cargo out, which was 7 per cent. It will be recollected, that he was to receive but 5 per cent. for his profit on the whole transaction.

It was proper, and, indeed, necessary to alter the bill of lading at Havana, when the destination of the brig was altered. The underwriters must have contemplated such an alteration ; and this too by Spanish agents. To have made a new bill of lading at this port, would have exposed the cargo to still stronger suspicions and greater risk ; and this could not have been done without manifest absurdity and falsehood on the face of it ; the cargo not having been shipped at that place.

*Bill of lading properly altered.*

As to the deception practiced by De Wolf and the agents, in ordering a disposition of the property, its existence is to be regretted. It is desirable that the utmost fairness and consistency should be stamped on these transactions throughout. But I cannot perceive that the underwriters have any cause to complain. It must be conceded, that if this cargo had been consigned directly to Levy himself, or even to the Spanish Intendant, it would not have invalidated the policy. Although the cargo was ordered to be sold, when it appears no such thing was intended, yet it was placing it under the ordinary circumstances of American cargoes, bound to these markets for sale. It was a deception calculated to lessen the risk, and benefit the underwriters ; as it served to impress more strongly on the property its real and American character, than would have been done by a naked consignment.

*Deception not in a material point.*

ALBANY, WHEELER, Senator. This case would seem to depend
Sept. 1823. on one of the following questions: 1. Was the delivery of the
N. Y. Firemen cargo to Levy, either in fact or construction of law, made in
Insurance New York? 2. Or, if not made there, was it made to Her-
Company nández & Chavitau, as the consignees of Levy, on the arri-
v. val of the brig at Havana?
De Wolf.

If the delivery was made to Levy, either in fact, or in
construction of law, at any time previous to the capture or
condemnation of the cargo, no question is made, but that
the warranty of American property was violated, he being,
at the time of the delivery, a resident of St. Thomas.

The case It is in proof that Levy, a resident merchant of the neu-
stated, and the tal or Danish Island of St. Thomas, entered into a negoti-
evidence con-
sidered. ation in the city of New York, with De Wolf, an American
citizen, and a merchant of that place, for the purchase of
a quantity of provisions. This negotiation terminated in
an agreement between the parties, the terms and conditions
of which are contained in their respective letters, bearing
date the 21st July, 1818. All the evidence throwing light
on this transaction, is contained in the letters of contract;
in the letters of instruction to Capt. Pratt, the master of the
George Washington ; in a letter from De Wolf to Hernán-
dez & Chavitau, of Havana ; in the letters of advice from the
latter to their correspondents at Porto Cavello and Laguira,
and in the sentence of condemnation by the Vice Admiralty
Court of the Republic of Venezuela. It is principally
from the above correspondence, that the facts in this
case are to be deduced : and, *prima facie*, there is nothing
upon the papers, when viewed separately, to falsify the
stipulation that the cargo was American property. But
when we connect these papers, and examine them as ori-
ginating in, and growing out of one entire adventure, the
evidence which they afford is by no means obscure.

Negotiation The negotiation, between Levy & De Wolf, was settled
tween Levy by their agreement on the 21st of July. On the face of that
id De Wolf. agreement, De Wolf contracted to purchase and to ship on
board the Warrior and the George Washington, at the port
of New York, a certain quantity of provisions ; and to deliv

er the same, at a stipulated price, for the freight, either in Havana, Laguira, or Porto Cavello.

Was the purchase originally made on the account and at the risk of Levy? or was it a contingent agreement, resting upon a precedent condition? Levy says, in his letter to De Wolf, (and, with the exception of this letter, it will be perceived that his name was cautiously concealed as a party to the voyage,) "I am desirous of purchasing of you, deliverable at the Havana, Laguira, or Porto Cavello, a certain quantity of beef, pork, &c.," and he closes by agreeing to pay freight, at a certain or fixed rate per barrel.

If this letter and De Wolf's answer were the only evidence in the case, then the delivery would appear to rest on a precedent condition; and Levy would not have been bound to make payment for the cargo, including insurance, commission and freight, before the delivery; but they are followed by the letter of De Wolf to Hernandez & Chavitau, and stand connected with their acts in relation to the George Washington and her cargo, after her arrival at the port of Havana. This correspondence, and these acts go far to elucidate the real character of the voyage.

Levy was a resident merchant of St. Thomas, a Danish and a neutral island; but he stood compromitted with the Spanish government, as a contractor or purveyor of navy or army supplies; and there is nothing in the proof to lessen the presumption, that he was, in reality, a native subject of Spain, and a mere denizen merchant at St. Thomas.

In the letter of De Wolf to Hernandez & Chavitau, enclosing the invoice of the cargo, he requests them to receive and dispose of the same to the "*best advantage on his account;*" and he is utterly silent, as it respects the contract of delivery, at a price certain to Levy. Here, then, was evident design, in case the vessel should be boarded by an enemy of Spain, to conceal the true character of the property; or why not direct Hernandez & Chavitau to deliver the cargo to Levy, on his complying with the conditions of the agreement of the 21st July. The agreement was to deliver to Levy, at a price certain: the letter of advice directs the cargo to be "sold to the best advantage on De Wolf's account."

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

Whether sale
was contin-
gent.
Levy's letter

And De
Wolf's an-
swer.

National cha-
racter of Levy

Letter to
Hernandez &
Chavitau

N. Y. Firemen
Insurance
Company
v.
De Wolf.

Evidence of
payment in
New York

This letter, also, authorizes Hernandez & Chavitau to draw on De Wolf for all disbursements; and they authorize their correspondent at Porto Cavello, to draw on him in New York, in the event of purchasing a return cargo, for 10,000 hard dollars. Here, then, is a presumption, strong, if not conclusive, that the shipment was paid for by Levy in New York, before the sailing of the ship; or why draw on De Wolf, for the purchase of a return cargo, if the proceeds of the outward cargo were to be paid for by Levy, on delivery in a Spanish port? or if the cargo was to be sold to the best advantage on De Wolf's account? for, in either event, De Wolf must have had available funds at the port where the cargo should be delivered. Then why draw on him for 10,000 hard, or silver dollars, payable in New York.

De Wolf farther instructs Hernandez & Chavitau, " If you think it best for my interest, to send the vessel to any other market, say to windward, you may do it;" but, in that case, he adds to the cost of the flour, as he expresses it, $1 50 per barrel, this being the precise sum which Levy contracted to pay, in case he directed the cargo to be delivered, either at Porto Cavello or Laguira.

Levy cau-
tiously con-
cealed.

Here, then, again, on the face of these papers, De Wolf authorized the vessel to be sent to any other market, " say to windward," and Levy is cautiously concealed, as a party in interest, although the contract with him, on the faith of which the shipment was expressly made, places the designation of the port of delivery under his absolute direction and control. It stands proved in the case that Hernandez & Chavitau were the persons selected by Levy to be the consignees of the cargo at Havana; and further, that they had his instructions as to its future disposition. Then why this ambiguous letter of De Wolf, if it was not to conceal the true character of the property?

Bill of lading
altered, &c.

On the arrival of the George Washington at Havana, Hernandez & Chavitau altered the bill of lading, on their own mere motion, by inserting after the words " at the port of Havana," the words, " or a market;" and directed the cargo to be delivered to Gerardo Patrullo, at Laguira, stating that this order was given in consequence of the " low prices

of flour and pork at Havana." Here is another discrepancy in this transaction. The fluctuations of the market could not affect De Wolf, as Levy had agreed to pay a stipulated price for the cargo. Much less could it concern Levy ; for he was made safe by his contract with the Spanish government. The cargo, when *in transitu*, was most clearly not *to a market*, but *to a Spanish depot of arms*.

The vessel, in pursuance of an order of Hernandez & Chavitau, with an altered bill of lading, which was originally special, but was, by the alteration, made general in its terms, left Havana, but with special instructions to deliver the cargo, either at Laguira or Porto Cavello ; and when near the first mentioned port she was captured by a Venezuelan privateer, her cargo libelled as Spanish property, and condemned, as such, by a Vice Admiralty Court of the Republic of Venezuela, which was at war with Spain. This case arises out of the claim made by the party ostensibly injured, against the insurers, for a total loss.

The insertion of the words, " and a market," extended the authority of the captain to the utmost limits of his discretion. The policy, and the contract with Levy, referred to three ports only, either of which was to be designated by Levy ; but here was a general latitude given by Hernandez & Chavitau, on the face of the bill of lading which extended from island to island, to dispose of the cargo, although proved that it was disposed of to Levy, before it left New York. The alteration of the bill of lading increased the risk ; for that very alteration, from its having been made in a belligerent port, and by a belligerent, was calculated to create suspicion of an attempt to mask the property under a neutral flag. That suspicion would add to the chances of its condemnation, on the ground that innocence never seeks concealment. The republic condemned the cargo, as belonging to her enemy, and released the ship as the property of her friend. In this, she did precisely what an American Court would have done, in similar circumstances.

The loss is positive, and it must fall either on our own citizens, or on the citizens of Spain, or a citizen of Denmark. The Vice Admiralty Court of Venezuela adjudged the pro-

ALBANY,
Sept. 1823

N. Y. Firemen
Insurance
Company
v.
De Wolf.

Vessel proceeds, and is captured, and cargo condemned.

Alteration of bill of lading an excess of authority.

And increased the risk.

The evidence justified the condemnation.

ALBANY,
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

perty to be Spanish, and condemned it as such. It was captured when entering a Spanish port, and a depot of arms. The description of the cargo, as well as its destination and object, viewed in connection with the letters of Hernandez & Chavitau, and the suspicious interlineation, made by them on the bill of lading, together with their order on the back of it, clearly justified the condemnation. Neither party, for aught we see, has complained that this was an unjust sentence.

When foreigners, and more especially belligerent foreigners, (and I consider Levy to have stood in the latter character, for he had violated his obligations of neutrality, by committing himself with Spain, *flagrante bello*,) seek the aid of our citizens to effect insurance, under the specious mantle of American property, they have no right to complain of the strictness of our Courts in scrutinizing their acts, and in protecting our insurers against frauds upon the American flag.

This property was warranted to be American. It was adjudged by a foreign tribunal to be Spanish. If the decree of that tribunal was correct, the warranty was false; and, consequently, the policy has been broken on the part of the assured; and there is an end of the question. The policy became void.

Insurers are necessarily strangers to the secret objects of other parties, who may frequently be stimulated by the hope of gain, to combine for the purpose of covering belligerent property, under the semblance of neutrality. In such cases, all the circumstances which give character to the property insured, and develope the ulterior views and intentions of the parties, are wholly under the control of the insured, who may, and probably will, forever be influenced by interest to suppress or conceal such papers as throw light on the merits of the case. The insurers, at common law, have no power to compel a disclosure; and the insured, it may be supposed, will cautiously conceal every fact which militates against himself.

But, as it has been settled, in this place that the sentence of a foreign Court of Admiralty shall not be received as con-

clusive of the character of the voyage, the decree of the Venezuelan Court can only be taken, in this case, as *prima facie* evidence that the cargo was Spanish property. A summary of the facts, with which I shall conclude, will show how far that decree is sustained or impeached by the evidence given in the Supreme Court.

Spain was engaged in a war with the republic of Venezuela. Levy, at that time, a resident merchant of a neutral island, engaged with the Spanish government, to supply the Spanish forces with certain provisions and clothing. He came to New York, and entered into a bargain to purchase of De Wolf, a citizen of the United States, articles corresponding to those which he had engaged to deliver the Spanish Intendant. De Wolf purchased the articles, and insured the property as American; and by an agreement with Levy, fixing the price of the freight, shipped the articles on board his own vessel, to be delivered at a Spanish port, a military and naval depot.

The vessel arrived at Havana, and was ordered to a second military depot, with her cargo; and on her voyage thither, she was captured by a Venezuelan cruiser, and her cargo condemned as enemy's property.

The letters of De Wolf, of Levy, and of Hernandez & Chavitau, carry with them strong evidence of a fictitious dress. Levy contracted, in New York, for the property; and the port of designation was placed at his disposition. Yet you hear nothing of him after he is lost sight of as the purchaser in New York. There is evidently a studied concealment in the papers, of Levy's agency in this business; and the conclusion, to my mind, is irresistible, that the ship was not ordered from Havana to a "better market," as Hernandez & Chavitau allege; but, in fact, she was directed to Laguira, by order of the Spanish Intendant. Levy was under the control of the Intendant. The provisions must have been known, on the arrival of the ship at Havana, as articles purchased on Levy's contract, for the use of the Spanish government; and it is too much to suppose, that any nation, at war, would for a moment permit an agent or con-

ALBANY
Sept. 1823.

N. Y. Firemen
Insurance
Company
v.
De Wolf.

Evidence given in the supreme court to support the condemnation

ALBANY,
Sept. 1823.

tractor to divert, or control, at his mere will, munitions expressly purchased for the use of its army or navy. *The property has been adjudged to be Spanish.* by a foreign tribunal, and the evidence in the case confirms the correctness of that decision.

I, therefore, am of opinion, that as the warranty has not been sustained, the judgment in the Court below should be reversed.

ERWIN & THORN, SENATORS, concurred.

The other members of the Court concurring in the result of the opinions delivered by THE CHANCELLOR and BRONSON, Senator—

It was thereupon ORDERED, ADJUDGED and DECREED, that the judgment of the Supreme Court be affirmed ; and that the plaintiffs pay to the defendant his costs, &c., and that the record be remitted, &c.

